# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION and CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>    Plaintiffs,<br><br>    v.<br><br>GREEN TREE SERVICING LLC, a Delaware limited liability company,<br><br>    Defendant. | )<br>)<br>)<br>)    15-cv-02064 (SRN-JSM)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**STIPULATED ORDER FOR PERMANENT**
**INJUNCTION AND MONETARY JUDGMENT**

Plaintiffs, the Federal Trade Commission ("Commission") and the Consumer

Financial Protection Bureau ("Bureau"), have filed their Complaint for a permanent

injunction and other relief in this matter.  The Commission brought this action pursuant

to Sections 5(a) and 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C.

§§ 45(a) and 53(b).  The Bureau brought this action pursuant to Sections 1031(a),

1036(a)(1), and 1054 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12

U.S.C. §§ 5531(a), 5536(a)(1), and 5564, and sought civil penalties pursuant to Section

1055 of the CFPA, 12 U.S.C. § 5565(c).  Defendant Green Tree Servicing LLC

("Defendant" or "Green Tree") waived service of the summons and the Complaint.  The

Commission, Bureau, and the Defendant stipulate to entry of this Order for Permanent

Injunction and Monetary Judgment ("Order").

THEREFORE, it is ORDERED as follows:

### FINDINGS

1.       This Court has jurisdiction over this matter.

2.       The Complaint alleges a claim upon which relief may be granted under

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); Sections 1031(a) and 1036(a)(1) of the

CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1); the Fair Debt Collection Practices Act

("FDCPA"), 15 U.S.C. §§ 1692-1692p; the Fair Credit Reporting Act ("FCRA"), 15

U.S.C. §§ 1681-1681x; and Section 6 of the Real Estate Settlement Procedures Act, 12

U.S.C. § 2605, and its implementing regulation, Regulation X, 12 C.F.R. part 1024

(formerly codified at 24 C.F.R. part 3500) (collectively "RESPA").

3.       For purposes of this settlement, Defendant neither admits nor denies any of

the allegations in the Complaint, except as specifically stated in this Order.  Only for

purposes of this action, Defendant admits the facts necessary to establish jurisdiction.

4.       All parties waive all rights to appeal or otherwise challenge or contest the

validity of this Order.  Defendant further waives and releases any claim it may have

against the Commission or the Bureau, and their employees, representatives, or agents.

5.       Defendant waives any claim that it may have under the Equal Access to

Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agrees to bear its own costs and attorney fees.

6.     The Plaintiffs and Defendant, by and through their counsel, have agreed that entry of this Order resolves all matters in dispute between them arising from the facts and circumstances alleged in the Complaint in this action that have taken place as of the Effective Date, except that the Bureau specifically reserves and does not release any liability arising under any provision of the Bureau's rules relating to mortgage servicing (12 C.F.R. § 1024.30, *et seq.*) as of January 10, 2014.

## DEFINITIONS

For purposes of this Order, the following definitions shall apply:

1.     "Collecting on past-due debt(s)" means recovering or attempting to recover, directly or indirectly, debts owed or due or asserted to be owed or due, for which consumers are currently in default, as default is defined in the loan agreement or applicable document creating the debt obligation.

2.     "Debt" means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

3.      "Defendant" means Defendant Green Tree Servicing LLC, and its successors and assigns.  For purposes of this definition, an "assign" means a person who

purchases all or substantially all of the assets of Green Tree Servicing LLC or of Green Tree Servicing LLC's division(s) or major business unit(s) that are engaged as a primary business in customer-facing servicing of residential mortgage loans.

4.      "Effective Date" means the date on which the Order is entered.

5.      "Grace period" means the period between the date when a loan payment is due and the date when Green Tree is permitted to assess a late fee under the related loan documents.

6.      "In-process loan modification" means a trial or permanent loan modification offered by a servicer that was either accepted by the borrower or for which the time for the borrower to accept the offer has not expired and the offer has not been rejected, but is not finalized as a permanent modification before servicing rights on the loan are transferred to another entity.  It includes trial modifications in which the prior servicer agreed to modify the loan payment terms unless Defendant has clear written evidence that the borrower has failed to perform under the trial loan modification terms. It also includes modifications in which the consumer completed making the trial payments before the loan was transferred to Defendant, but the permanent modification was not input into the prior servicer's system before the transfer.

7.      "Investigation" means objectively evaluating the circumstances and considering information, including an assessment of the relevance, reliability, accuracy, integrity, and completeness of such information, to determine whether a consumer owes a

debt in the amount asserted or to assess a borrower's notice of error or qualified written request.  The information Defendant shall assess in an investigation, where applicable to the dispute, shall include but not be limited to:

(a)     the information that Defendant received from the credit originator or any prior servicer or owner of the debt, such as: (i) the consumer's credit application, (ii) the credit contract between the consumer and the credit originator, (iii) documents with the current or former name, address, and telephone number of the consumer, (iv) documents with the consumer's account number, in whole or in part, and periodic billing statements, (v) payment/transaction history, (vi) documents with the date and outstanding balance, and (vii) servicing notes;

(b)     the information that Defendant received from data aggregators, data brokers, consumer reporting agencies, skip tracers, and other third parties, such as: (i) documents with the current or former name, address, and telephone number of the consumer, (ii) documents with consumer report information, including credit scores and updates to the information in consumer reports, and (iii) the scoring of the debt through the use of a predictive model;

(c)     the information that Defendant created or maintained in collecting

on the debt, such as servicing notes and payment history from the immediately preceding two years; and

(d)     the information the Defendant received from the consumer denying, disputing, or challenging the claim that the consumer owes the debt or the amount of the debt, such as: (i) documents with the consumer's current or former name, address, and telephone number, (ii) receipts or other evidence of payment from the credit originator or any prior servicer or owner of the debt, or a debt collector, (iii) canceled checks, bank account statements, credit card statements, and other documents evidencing payment, and (iv) a consumer dispute relating to the disputed amount.

8.     "Involuntary transfer" means a transfer when the transferor servicer is in breach of, or default under, its servicing agreement for loss mitigation related-servicing performance deficiencies, or is in receivership, and is required to transfer servicing to another servicer in thirty (30) days or less by an unaffiliated investor, or a court or regulator with jurisdiction.

9.     "Loss mitigation" means modified payment arrangements, trial, permanent and in-process loan modifications, forbearance plans, short sales, deed-in-lieu agreements and any other non-foreclosure home retention or non-retention option offered by the owner or assignee of a mortgage loan that is made available to the consumer through a

prior servicer or Defendant.

10.     "Portfolio" means a group of loans for which the mortgage servicing rights are transferred to or from Defendant pursuant to a single contract for the sale or transfer of mortgage servicing rights.

11.     "Related consumer action" means a private action by or on behalf of one or more consumers, or enforcement action by another governmental agency, entity, or representative, brought against Defendant based on substantially the same conduct or issues as alleged in the Complaint.

12.     "Servicing" means collecting, receiving and applying payments made on a consumer's account pursuant to the terms of the loan agreement, such as payments of principal, interest, taxes, and fees; administering loan accounts; receiving and processing data and documentation for loan accounts transferred from prior servicers; making loan-related communications; responding to borrower notices asserting an error and qualified written requests; providing periodic billing statements to consumers; maintaining records of the status of consumers' loan accounts; providing information to and resolving disputes with consumers regarding loan accounts; disbursing payments from consumers' escrow accounts; providing loss mitigation, including but not limited to loan modifications and short sales; pursuing foreclosure; repossessing property; filing bankruptcy claims; calculating deficiency judgments; using consumer reports and furnishing information to consumer reporting agencies; and collecting or assessing fees in

relation to any of the foregoing.

13.     "Transfer," as it appears in Sections IV, V, and VII of this Order, means the transfer of mortgage servicing rights, or of servicing responsibilities, including through subservicing or whole loan servicing arrangements.

## I.     ORDER FOR EQUITABLE MONETARY RELIEF

**IT IS ORDERED** that:

A.     Judgment is entered in favor of the Commission and the Bureau against Defendant in the amount of Forty Eight Million Dollars ($48,000,000) total as follows:

      1.     Eighteen Million Dollars ($18,000,000) for alleged violations of the FTC Act, CFPA, and FDCPA with respect to Defendant's alleged misrepresentations relating to payment methods that entail a convenience fee.

      2.     Thirty Million Dollars ($30,000,000) for alleged violations of the FTC Act, CFPA, FDCPA, and RESPA with respect to Defendant's conduct relating to short sales and in-process loan modifications, including Defendant's alleged failure to timely respond to qualified written requests relating to in-process loan modifications and with respect to Defendant's alleged misrepresentations about the time it will take to review short sale requests.

B.     Within ten (10) days of entry of this order, Defendant is ordered to pay to

the Bureau $48,000,000 dollars in full satisfaction of the judgment in favor of the

Commission and the Bureau as set forth in Paragraphs A.1 and A.2 of this Section. Such

payment shall be made by wire transfer to the Bureau or to such agent as the Bureau may

direct, and in accordance with wiring instructions to be provided by counsel for the

Bureau.

C.     All money paid to the Bureau pursuant to this Section shall be deposited

into a fund or funds administered by the Bureau or its agent in accordance with

applicable statutes and regulations to be used for consumer redress, including but not

limited to refund of moneys, restitution, or other monetary relief, and for any attendant

expenses for the administration of such redress.

D.     If the Bureau, in consultation with the Commission, decides that redress to

consumers is wholly or partially impracticable or otherwise inappropriate or funds remain

after redress is completed, the Bureau may apply any remaining money for such other

relief (including consumer information remedies) as it determines to be reasonably

related to Defendant's practices alleged in the Complaint. Any funds not used for such

relief are to be deposited to the U.S. Treasury as disgorgement. Defendant has no right to

challenge any actions the Bureau, the Commission, or their representatives may take

pursuant to this Paragraph.

E.     Redress provided by Defendant shall not limit consumers' rights in any

way or prevent Defendant from asserting in a related consumer action that a consumer

should not recover for any amounts paid under this Order.

F.      In light of the monetary relief to be paid to the Bureau, and to avoid double payment, the FTC is subrogating its claim for equitable monetary relief to the Bureau's claim.

## II.      ORDER TO PAY CIVIL MONEY PENALTIES

A.      Under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the alleged violations of law in the Complaint, and taking into account the factors set forth in 12 U.S.C. § 5565(c)(3), Defendant shall pay a civil money penalty of Fifteen Million Dollars ($15,000,000) to the Bureau, as directed by the Bureau and as set forth herein.

B.      Within ten days of the Effective Date, Defendant shall pay the civil money penalty in the form of a wire transfer to the Bureau or to such agent as the Bureau may direct, and in accordance with wiring instructions to be provided by counsel for the Bureau.

C.      The civil money penalty paid under this Order shall be deposited in the Civil Penalty Fund of the Bureau in accordance with Section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

D.      Defendant shall treat the civil money penalty as a penalty paid to the government for all purposes.  Regardless of how the Bureau ultimately uses those funds, Defendant shall not:

1. Claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any civil money penalty that Defendant pays under this Order; or

2. Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made pursuant to any insurance policy, with regard to any civil money penalty that Defendant pays under this Order.

E.     To preserve the deterrent effect of the civil money penalty, in any related consumer action, Defendant shall not argue that Defendant is entitled to, nor shall Defendant benefit by, any offset or reduction of any monetary remedies imposed in the related consumer action, because of the civil money penalty paid in this action ("Penalty Offset").  If the court in any related consumer action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Bureau, and pay the amount of the Penalty Offset to the U.S. Treasury.  Such a payment shall not be deemed an additional civil money penalty and shall not be deemed to change the amount of the civil money penalty imposed in this action.

F.     In light of the monetary relief to be paid to the Bureau, and to avoid double payment, the FTC is subrogating its claim for civil penalties to the Bureau's claim.

## III.     ADDITIONAL MONETARY PROVISIONS

A.     In the event of any default on Defendant's obligations to make payment

under this Order, interest, computed pursuant to 28 U.S.C. § 1961, as amended, shall

accrue on any outstanding amounts not paid from the date of default to the date of

payment, and shall immediately become due and payable.

B.      Defendant relinquishes all dominion, control, and all legal and equitable

right, title, and interest to the funds paid to the fullest extent permitted by law and no part

of the funds shall be returned to Defendant.

C.      The facts alleged in the Complaint will be taken as true, without further

proof, in any subsequent civil litigation by or on behalf of the Commission or Bureau in a

proceeding to enforce its rights to any payment or monetary judgment pursuant to this

Order.

D.      The facts alleged in the Complaint establish all elements necessary to

sustain an action by the Commission or Bureau pursuant to Section 523(a)(2)(A) of the

Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel

effect for such purposes.

E.      Defendant acknowledges that its Taxpayer Identification Number, which

Defendant previously submitted to the Commission or Bureau, may be used for collecting

and reporting on any delinquent amount arising out of this Order, in accordance with 31

U.S.C. § 7701.

F.      For a period of three (3) years from the Effective Date, within thirty (30)

days of the entry of a final judgment, consent order, or settlement in a related consumer

action, Defendant shall notify the Bureau Enforcement Director of the final judgment, consent order, or settlement in writing.  That notification shall indicate the amount of redress, if any, that Defendant paid or is required to pay to consumers and should describe the consumers or classes of consumers to whom that redress has been or will be paid.

## IV.    INJUNCTION AGAINST UNSUBSTANTIATED CLAIMS

**IT IS FURTHER ORDERED** that Defendant, Defendant's officers, agents, and employees, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

A.    Making any representation, expressly or by implication, that a consumer's account has unpaid balances, payment due dates, interest rates, monthly payment amounts, delinquency statuses, unpaid fees, or other amounts due, unless, at the time of making the representation, Defendant can substantiate such a representation, including but not limited to situations in which:

1.    Defendant knows or reasonably should know that a consumer, at the time the consumer's loan was transferred to Defendant, was performing or previously completed performance under a trial or permanent loan modification with the prior servicer of the loan but Defendant continues to attempt collection from the consumer under

Page 13 of 65

the original, unmodified mortgage loan terms.  Defendant reasonably should know that a consumer was performing or previously completed performance under a trial or permanent loan modification with a prior servicer once Defendant receives any information from the prior servicer, the consumer, or any other source substantiating that the consumer was performing or previously completed performance under a trial or permanent loan modification; or

2.     Defendant knows or reasonably should know that the information for the account is facially unreliable, materially inaccurate, or missing material information, but Defendant continues to attempt collection on the account without commencing and completing an investigation regarding the account.

3.     Nothing in this provision shall be interpreted to preclude Defendant from accurately representing for informational purposes contractual amounts that remain due and owing until a permanent loan modification has been finalized, provided that such representation does not mislead a consumer regarding the amounts due under the modification.

B.     Failing, after a consumer orally denies, disputes, or challenges Defendant's claim that the consumer owes a debt or owes a debt in the amount asserted to: (i) provide

the consumer orally and contemporaneously with instructions for submitting the dispute

in writing; and (ii) within 14 days of the consumer disputing Defendant's claim, provide

the consumer clear and conspicuous written instructions on how to submit the dispute in

writing; and

      C.    Failing, after a consumer denies, disputes, or challenges, in

writing, the Defendant's claim that the consumer owes the debt or owes the debt in the

amount asserted, to:

           1.    Within fourteen (14) days after the denial, dispute, or challenge, or

                  when the debt is next reported to a consumer reporting agency, if

                  earlier, report the debt as disputed; and

           2.    Promptly after the denial, dispute, or challenge:

                a.    Cease collection of any disputed amount, inform the

                      consumer that it has ceased collection of the disputed amount,

                      and, where the decision is within Defendant's control, not

                      transfer servicing to any person or entity other than the

                      creditor to whom the debt is owed, until the Defendant

                      satisfies its obligations to conduct an investigation and

                      respond as set forth in Paragraphs (b) and (c) below or obtains

                      an agreement from the transferee servicer to conduct such an

investigation and respond as set forth in Paragraphs (b) and (c) below;

b.     Commence and complete, within thirty (30) days after a consumer denies, disputes, or challenges Defendant's claim that a consumer owes the debt or that he or she owes the debt in the amount asserted, an investigation of the denial, dispute, or challenge, unless the consumer provides information that is relevant to the investigation during the 30-day time period, in which case the investigation may be extended for no more than fifteen (15) additional days.  ***Provided that*** Defendant shall not be required to investigate any denial, dispute, or challenge if it reasonably determines that the denial, dispute, or challenge is frivolous or irrelevant.  A dispute qualifies as frivolous or irrelevant if the Defendant does not have sufficient information to investigate and the consumer does not provide the necessary information when asked, or if Defendant has previously complied with its obligation to investigate and respond and the consumer does not provide to Defendant or Defendant does not otherwise acquire or obtain information, data, or documentation that was not considered

in any prior investigation.  Defendant shall notify the consumer within five (5) business days of Defendant's determination if the denial, dispute, or challenge is not investigated under this proviso; and

c.    If Defendant reasonably concludes after its investigation:

i.    That the consumer owes the debt in the amount asserted, Defendant, within ten (10) days of reaching its conclusion, shall provide verification of the debt to the consumer, inform the consumer of its conclusion, and provide the basis for it, after which it may resume collection of the previously-disputed amount.  If the consumer continues to dispute the debt, nothing in this order supersedes the requirement of § 623(a)(3) of the FCRA, 15 U.S.C. § 1681s-2(a)3, that Defendant convey the dispute when furnishing information on the debt to any consumer reporting agency.

ii.    That the consumer does not owe the debt or the debt cannot be verified, Defendant shall, within five (5) days of reaching its conclusion: (a) inform the consumer of its conclusion and the basis for it; (b)

request that each consumer reporting agency to which

Defendant had reported the debt or caused the debt to

be reported, delete the item from the consumer's credit

reporting file; (c) cease collection; and (d) where the

decision is within Defendant's control, not transfer

servicing to any person or entity other than the creditor

to whom the debt is allegedly owed.

iii.   That the consumer does owe the debt but not in the

amount that Defendant asserted, Defendant shall,

within five (5) days of reaching its conclusion: (a)

inform the consumer of its conclusion and the basis for

it; and (b) provide to each consumer reporting agency

to which the debt has been reported any correction to

the reported information that is necessary to make the

information provided by Defendant accurate, after

which it may continue collection.

*Provided that,* if the consumer initiates contact with Defendant by any means,

Defendant may respond to the consumer prior to the completion of the investigation.

*Provided further that* the limitations on transfer in Subsections IV.C.2.a and

IV.C.2.c.ii shall not apply when the transfer is between owners of the right to perform

servicing who do not perform the servicing and there is no change in the subservicer.

*Provided further that*, nothing in this Section IV prohibits Defendant from requiring consumers who deny, dispute, or challenge a debt on the grounds of fraud or identity theft to do so in writing, so long as Defendant clearly and conspicuously discloses these requirements.  Once Defendant receives an identity theft report, the requirements of § 623(a)(6)(B) of the FCRA, 15 U.S.C. § 1681s-2(a)(6)(B), apply.

## V.   DATA INTEGRITY REQUIREMENT

**IT IS FURTHER ORDERED** that Defendant, in connection with loan servicing and collection activities, shall, no later than one hundred and twenty (120) days after the date of entry of this Order, establish and maintain a comprehensive data integrity program ("Program") reasonably designed to ensure the accuracy, integrity, and completeness of the data and other information about accounts that Defendant services, collects, or sells, including any accounts acquired by or transferred to Defendant.  The Program, the content and implementation of which must be fully documented in writing, shall contain administrative, technical, and physical safeguards appropriate to the nature, size, complexity, and scope of Defendant's loan servicing activities, and shall include:

A.     The designation of an employee or employees to oversee the Program;

B.     The maintenance of sufficient personnel that are adequately trained to perform the Program requirements in a timely and legal manner;

C.      The identification of material internal and external risks to the accuracy, integrity, and completeness of loan servicing data that could result in material errors to consumers' accounts and assessment of the sufficiency of any safeguards in place to control these risks.  At a minimum, this risk assessment shall consider risks in each relevant area of operation, including, but not limited to (1) employee training and management, (2) information systems, including network and software design, servicing transfer protocols, information processing, storage, transmission, and disposal, and (3) prevention, detection, and response to any systems failure;

D.      The completion of due diligence prior to receiving transferred mortgage servicing rights.  Specifically, prior to receiving the transfer of mortgage servicing rights, Defendant shall conduct due diligence to understand and implement steps necessary to resolve issues with the type of loan level information and documentation in the transferor's possession and control, the transferor's ability to transfer the information electronically, in images, or only in paper records, material gaps in the transferor's records, and Defendant's ability to promptly process the information to be provided by the transferor, and otherwise ensure that Defendant will be able to comply with its servicing obligations with respect to every loan transferred.  Defendant shall seek assurance that the transferor will transfer all material loan level information in its possession or control at or before the time of transfer.

E.     The testing, identification, and correction of material errors in the following data fields in Defendant's servicing systems of record: monthly payment amount, principal balance, interest rate, loan term, escrow account balance, suspense account balance, delinquency status, loss mitigation status, and foreclosure status (collectively, the "Tested Data Fields").

1.     Portfolios Tested and Timing for Testing Portfolios.

a.     *Testing of Portfolios Transferred After the Effective Date of this Order*.  In addition to the requirements in Section VII.A.3 relating to loans in loss mitigation, within twenty (20) days after the transfer of any portfolio transferred after the Effective Date of this Order, or within twenty (20) days after the establishment of the Program, whichever is later, Defendant shall conduct a "Data File Review."  A Data File Review shall mean testing to examine the completeness and accuracy of loan information and to identify material errors. This shall include comparing the Tested Data Fields in Defendant's servicing systems of record as of the loan transfer cutoff date for material errors against the electronic data and the loan-level documents provided by the transferor

servicer from which Defendant acquired the servicing rights to the portfolio.

b.  *Previously Acquired Portfolios*.  To the extent that Defendant is, as of the Effective Date, servicing mortgage loans in portfolios at risk for widespread or systemic errors in the Tested Data Fields, for which portfolios Defendant acquired the servicing rights after January 1, 2010, Defendant shall perform a Data File Review within 15 days after the establishment of the Program.  A portfolio is at risk for widespread or systemic errors if it exhibits any of the following factors:  (1) the portfolio was an involuntary transfer, (2) the portfolio transferred under an agreement containing a disclaimer as to the availability of loan account level information and documents, (3) the portfolio transferred from a servicer or owner that Defendant has learned previously provided materially inaccurate information for more than 5% of the portfolio or had missing material information for more than 5% of the portfolio, (4) Defendant has other information about the portfolio's prior owner or servicer and its methods of doing business that suggests that

more than 5% of the portfolio contains material errors or

materially incomplete information, or (5) after onboarding,

consumers have disputed in writing the accuracy of the

information in accounts amounting to more than 2% of a

portfolio serviced by Defendant.

2.      Percentage of Each Portfolio to be Tested.

   a.      All Data File Reviews, as prescribed in Subsection V.E.1, and

On-Going Testing, as prescribed in Subsection V.E.4, shall be

statistically valid and based on an appropriate sampling

methodology, such that the results from the sample can be

reliably extrapolated to the loan portfolio as a whole, and

shall include both random and risk-based selection criteria.

   b.      If a Data File Review performed pursuant to Section V.E.1. of

this Order reveals a material error rate of more than 5% with

respect to any Tested Data Field(s) in a portfolio, Defendant

shall, within thirty (30) days, complete a Data File Review of

such field(s) for all loans in the portfolio.  In the event that

the full-portfolio Data File Review described in this section

reveals a material error rate exceeding 5% of all loans in the

portfolio with respect to any of the field(s) tested under this

subsection, Defendant shall perform a Data File Review of

such field(s) for the entire portfolio every six months until the

material error rate falls below 5%.

3.     **Correction of Errors.**  Upon completion of any Data File Review,

Defendant shall correct and remediate any individual account errors

identified by the Defendant, including promptly refunding or

reversing any overcharges and stopping foreclosure where

appropriate.

4.     **Ongoing Testing.**  Within 180 days of the Effective Date, and every

six months thereafter, Defendant shall identify any portfolios

serviced by Defendant for which, in the immediately preceding six

months, consumers representing more than 2% of the relevant

portfolio have disputed in writing the accuracy of the information in

the Tested Data Fields.  In the event any such portfolios exist,

Defendant shall determine whether there exist any systemic issues

giving rise to the disputes about errors in the accuracy of the Tested

Data Fields in the portfolio and, if any errors are found, Defendant

shall develop and implement a plan to correct the errors.  ***Provided***

***that***, when a consumer orally denies, disputes, or challenges the

accuracy of the information contained in a Tested Data Field,

Defendant shall (i) provide the consumer orally and

contemporaneously with instructions for submitting the dispute in

writing; and (ii) within 14 days of the consumer disputing

Defendant's claim, provide the consumer clear and conspicuous

written instructions on how to submit the dispute in writing.

***Provided that*** the requirements of this Subsection V.E shall not apply to transfers

when the transfer is between owners of the right to perform servicing who do not perform

the servicing and there is no change in the subservicer.

F.      The design and implementation of reasonable safeguards to control the

risks identified through risk assessment, and regular auditing or testing or monitoring of

the effectiveness of the safeguards' key controls, system, and procedures;

G.      The regular auditing, testing, or monitoring of the effectiveness of the

Program using statistically valid samples, such that the samples include both random and

risk-based selection criteria and the results from the samples can be reliably extrapolated

to the Program as a whole; and

H.      The evaluation and adjustment of the Program in light of the results of the

required auditing, testing, or monitoring, and any material changes to Defendant's

operations or business arrangements that may significantly impact the Program, or any

other circumstances that Defendant knows or has reason to know may have a material

impact on the integrity, accuracy, and completeness of Defendant's loan servicing

process, or data and other information about accounts that Defendant services, collects, or sells.

***Provided that***, in the event of a conflict between this Section V and the requirements of federal, state, or local laws or the standard provisions imposed on servicers by the Department of Treasury, Fannie Mae, Freddie Mac, Ginnie Mae, the Federal Housing Administration, the Department of Veterans Affairs, the Rural Housing Administration, and any other similar organization that may come into existence after the entry of this Order such that Defendant cannot comply with this Section V without violating these requirements, Defendant shall document such conflicts and notify the Commission and the Bureau that it intends to comply with the requirements to the extent necessary to eliminate the conflict.

***Provided further that,*** in the event of an involuntary transfer to Defendant which results in a delay in the transferor's transfer of relevant information or a volume of errors in the transferor's data that prevents Defendant from being able to comply with the time limits in this Section, Defendant shall submit a written plan to the Bureau and the Commission within ten (10) days after the date of the transfer identifying the cause of the delay and setting forth the specific steps it is taking, the resources it is devoting, and Defendant's expected timeline for complying with the requirements of this Section.  If such plan is not objected to by the Bureau or the Commission within ten (10) days of submission of the plan, Defendant must proceed to implement the plan.  If the Bureau or

the Commission objects to the plan within ten (10) days of submission, Defendant will

make reasonable efforts to amend the plan to address any objection.  Defendant shall not

take more than 120 days from the date of the transfer to satisfy the requirements of this

Section.

## VI.    ASSESSMENT

**IT IS FURTHER ORDERED** that:

A.    Defendant shall, within one hundred and twenty (120) days after the

implementation of the Data Integrity Program required by Section V of this Order, and

biennially thereafter for eight (8) years after entry of this Order, obtain an assessment and

report ("Assessment") from a qualified, objective, independent, third-party professional,

the identity of which is agreed to by a representative of the Commission and a

representative of the Bureau, that, using procedures and standards generally accepted in

the profession:

1.    Sets forth the specific data integrity program that Defendant has

        implemented and maintained during the reporting period;

2.    Explains how the data integrity program is appropriate to

        Defendant's size and complexity, and the nature and scope of

        Defendant's activities;

3.    Explains how the data integrity program meets or exceeds the

        protections required by Section V of this Order; and

4.      Certifies that to the best of the certifier's knowledge and belief the

data integrity program is operating with sufficient effectiveness to

provide reasonable assurance of the material accuracy, integrity, and

completeness of Defendant's records.

B.      Defendant shall provide a copy of the first Assessment to the Commission

within ten (10) days after the Assessment is delivered to Defendant.  Defendant shall,

within thirty (30) days of a request, provide the Commission with a copy of all plans,

reports, studies, reviews, audits, audit trails, policies, training materials, and assessments,

whether prepared by or on behalf of Defendant, relied upon to prepare such Assessment.

All subsequent biennial Assessments shall be retained by Defendant and a copy provided

to the Commission within thirty (30) days of request.  The Commission will provide to

the Bureau a copy of all Assessments and any other materials produced pursuant to this

Section VI of this Order.

## VII.   INJUNCTION RELATING TO MORTGAGE SERVICING

**IT IS FURTHER ORDERED** that Defendant, Defendant's officers, agents, and

employees, and all other persons in active concert or participation with any of them, who

receive actual notice of this Order, whether acting directly or indirectly, are permanently

restrained and enjoined from:

**<u>Limitations on the Transfer of Servicing for Loans in Loss Mitigation</u>**

A.      Transferring or acquiring servicing for loans in loss mitigation or with a

loss mitigation application pending, regardless of whether Defendant is the transferor or transferee, unless:

1.   The transferor or transferee identifies by loan number the following categories of loans at least thirty (30) days prior to transfer, and updates such information at least five (5) days prior to transfer:

    a.   Loans in any stage of pending loss mitigation, including but not limited to in-process loan modifications;

    b.   Loans approved or converted to a permanent loss mitigation outcome within sixty (60) days of transfer; and

    c.   Loans denied loss mitigation within sixty (60) days of transfer;

2.   The transferor agrees to make all reasonable efforts to provide the transferee all the following information in its possession or control, prior to transfer or at a minimum, agrees to provide this information by the date of the transfer: all account-level documents and data relating to loss mitigation, including a copy of the mortgage note, periodic billing statements for the two years prior to the service transfer, payment history for the two years prior to the service transfer, escrow and suspense account information, loss mitigation applications, loss mitigation notices, documentation and information

Page 29 of 65

received from the borrower for purposes of evaluating the borrower for loss mitigation, any net present value or other analysis by a servicer in connection with a borrower's application for loss mitigation, loss mitigation agreements, any written communications or notes of oral communications with the borrower about the loss mitigation, and any other information needed to administer any pending loss mitigation applications or in-process loan modifications; and

3.  The contract for the transfer includes the following requirements:

   a.  The transferee will engage in quality control work to validate that the loss mitigation data matches the images and paper documents received, make reasonable efforts to identify missing loss mitigation data, documentation, or information and request missing information from the transferor within fifteen (15) days of transfer; and

   b.  Within ten (10) days of a request from the transferee, the transferor will provide missing or incomplete loss mitigation data, documentation, or information in its possession or control;

4.  The contract for the transfer also includes the following

requirements:

a.      The transferee will honor loss mitigation agreements entered

into by the prior servicer, including but not limited to in-

process loan modifications;

b.      The transferee will continue processing pending loss

mitigation requests received in the transfer; and

c.      Within thirty (30) days of transfer, the transferee will finish

reviewing and resolve any loss mitigation request that was

pending within sixty (60) days of transfer for which the

transferee or buyer lacks clear written evidence that such

request was denied, and provide the consumer an opportunity

to provide any necessary missing information.

**Provided, however, that** the requirements of Subsections VII.A.1, 2, and 3 shall

not  apply to transfers when the transfer is between owners of the right to perform

servicing who do not perform the servicing and there is no change in the subservicer.

**Short Sales**

B.      Failing to send consumers written confirmation within five business days of

receipt of a short sale application.  If the short sale application is incomplete, Defendant

must include in this written confirmation a list of any missing documents required to

complete the short sale application; and

C.      Failing to complete an evaluation of the short sale application and communicate a decision to the consumer prior to the date of a foreclosure sale (provided that Defendant receives the completed short sale application more than 14 days before the foreclosure sale) or within thirty (30) days after receipt of a complete short sale application, whichever is earlier, except that Defendant may have an additional fifteen (15) days to communicate its decision to the borrower when waiting to receive required information from third parties, provided Defendant promptly updates the borrower with the reason for this delay in writing.

**Other Loss Mitigation Requirements**

D.      Failing, within ninety (90) days after entry of this Order, to make Defendant's loss mitigation application available to consumers at no cost by, at a minimum, making it publicly available and readily accessible on Defendant's website and providing it upon request to consumers.  The application shall identify all required documentation and information necessary to complete a loss mitigation application;

E.      Failing, within ninety (90) days after the date of entry of this Order, to maintain sufficient personnel that are adequately trained to handle loss mitigation requests in a timely and legal manner;

F.      Failing, within ninety (90) days after the date of entry of this Order, to implement and maintain a centralized document management system for tracking and storing incoming loss mitigation documents, including those submitted by consumers,

staffed with sufficient personnel that are adequately trained to prevent significant

backlogs and lost documents;

G.      Failing, within ninety (90) days after the date of entry of this Order, to

implement and maintain an online portal linked to Defendant's primary servicing system

where consumers can check, at no cost, the status of their loss mitigation requests.  The

portal must, among other things:

      1.      Enable consumers to submit documents electronically;

      2.      Provide an electronic receipt for any documents submitted; and

      3.      Update the status of pending loss mitigation requests at least every

            10 business days;

H.      Failing, within ninety (90) days after the date of entry of this Order, to take

reasonable steps to ensure that personnel assigned to consumers pursuant to the Bureau's

rules relating to continuity of contact (12 C.F.R. § 1024.40):

      1.      Refer and transfer consumers to a loss mitigation or other

            appropriate supervisor upon request;

      2.      Have access to individuals able to stop foreclosure proceedings

            when necessary to comply with this Order and other applicable

            requirements; and

      3.      Are not subject to compensation arrangements that encourage

            collection over loss mitigation activity.

*Provided that*, in the event of a conflict between this Section VII and the requirements of federal, state, or local laws or the standard provisions imposed on servicers by the Department of Treasury, Fannie Mae, Freddie Mac, Ginnie Mae, the Federal Housing Administration, the Department of Veterans Affairs, the Rural Housing Administration, and any other similar organization that may come into existence after the entry of this Order such that Defendant cannot comply with this Section VII without violating these requirements, Defendant shall document such conflicts and notify the Commission and the Bureau that it intends to comply with the requirements to the extent necessary to eliminate the conflict.

*Provided further that*, in the event of an involuntary transfer to Defendant which results in a delay of the transferor's transfer of relevant information and prevents Defendant from being able to comply with the time limits in Section VII.A, Defendant shall submit a written plan to the Bureau and the Commission, within ten (10) days after the date of the transfer, identifying the cause of the delay and setting forth the specific steps it is taking, the resources it is devoting, and Defendant's expected timeline for complying with the requirements of Section VII.A.  If such plan is not objected to by the Bureau or the Commission within ten (10) days of submission of the plan, Defendant must proceed to implement the plan.  If the Bureau or the Commission objects to the plan within ten (10) days of submission, Defendant will make reasonable efforts to amend the plan to address any objection.  In no event shall Defendants fail to honor loss mitigation

agreements entered into by the prior servicer, fail to continue processing pending loss

mitigation requests received in the transfer, or take more than 60 days from the date of

the transfer to satisfy the requirements of Section VII.A.

## VIII.   HOME PRESERVATION REQUIREMENT

**IT IS FURTHER ORDERED** that Defendant shall, no later than sixty (60) days

after the date of entry of this Order, establish and implement a home preservation plan

("Plan") to identify and review Affected Consumers for loss mitigation options, provide

for the solicitation and fast-track evaluation of loss mitigation applications, and stop

pending foreclosure sales for such consumers to the extent necessary to permit the

consumers to be solicited and considered for loss mitigation.  The Plan shall remain in

effect for a period of five (5) years from the Effective Date.  Affected Consumers are

consumers with first- or second-lien residential loans that were transferred to Defendant

between January 1, 2010 and November 2014 and as of the Effective Date (1) are 45 or

more days delinquent or have been referred to foreclosure, but are more than 37 days

before a foreclosure sale, or (2) are serviced by Defendant and become eligible for

referral to foreclosure at any point from the Effective Date until five years from the

Effective Date, provided that Defendant still services the loan at that time.

A.     *Convert In-Process Loan Modifications to Permanent Modifications.*

Defendant shall promptly send a permanent modification agreement to Affected

Consumers with In-Process Loan Modifications that were fully underwritten prior to the

trial period and received all necessary investor approvals but for which the consumer did not previously enter a permanent modification agreement.  Such consumers shall be converted to a permanent modification upon execution of the permanent modification documents, consistent with applicable program and investor guidelines.

B.      *Solicitation and Fast-Track Evaluation of Loss Mitigation Applications*. For all Affected Consumers not accounted for in Paragraph A above, Defendant must:

1.      Engage in consumer outreach to obtain complete loss mitigation applications by: (i) Telephone and mail outreach to contact consumers and collect documents; (ii) For incomplete loss mitigation applications, a telephone and mail campaign to notify consumers of the additional documents and information needed to make the loss mitigation application complete; and (iii) Translation services when requested by a consumer or if Defendant has reason to believe that the consumer is not proficient in English.

2.      Promptly evaluate consumers for all loss mitigation options available under applicable investor guidelines, including by: (i) Providing a dedicated team of underwriters; (ii) Reviewing complete loss mitigation applications within 20 days of receipt; and (iii) Clearly identifying the terms of any loss mitigation offer (such as interest rate, amortization term, and balloon payments) and

identifying the modified principal balance.

C.     *Stop Pending Foreclosures.*  If necessary to permit Defendant to complete

the actions described in Paragraphs A and B above before a foreclosure

sale, Defendant shall take all available measures to postpone any

foreclosure sale scheduled to occur and to prevent the entry of a foreclosure

judgment or the entry of an order for foreclosure sale in connection with a

foreclosure initiated with respect to the loan under consideration for loss

mitigation during the pendency of the actions required in Paragraphs A and

B above.

D.     Defendant may resume foreclosure sales for Affected Consumers under any

of the following conditions:

1.     Despite Defendant's reasonable efforts, including taking all steps

described in Paragraph B, the consumer (i) has not responded to

Defendant's outreach effort within 30 days of Defendant's most

recent attempt to contact the consumer under Section VIII.B, or (ii)

the consumer has responded to Defendant's outreach efforts but has

not provided Defendant with all materials necessary to permit

Defendant to evaluate the consumer for loss mitigation options,

notwithstanding Defendant's attempts to obtain such material

pursuant to Section VIII.B.1.ii, or (iii) does not execute a loss

mitigation offer prior to or at the expiration of the offer;

2.      The consumer states in writing that he or she does not want to be

considered for a loss mitigation option; or

3.      Defendant has evaluated the consumer's complete loss mitigation

application for all available loss mitigation options, and (i)

Defendant has determined the consumer does not qualify for any

loss mitigation option and the time for appeal has expired or the

appeal has been denied, or (ii) the consumer has rejected an offer of

loss mitigation.

E.      The requirements of this subsection VIII shall not apply to any loan (1) for

which Defendant does not own the right to service or sub-service as of the Effective

Date; or (2) that is not subject to foreclosure or collection activity because it has been

charged off.

***Provided that***, in the event of a conflict between this Section VIII and the

requirements of federal, state, or local laws, the standard provisions imposed on servicers

by the Department of Treasury, Fannie Mae, Freddie Mac, Ginnie Mae, the Federal

Housing Administration, the Department of Veterans Affairs, the Rural Housing

Administration, and any other similar organization that may come into existence after the

entry of this Order, the National Mortgage Settlement, or applicable investor guidelines

such that Defendant cannot comply with this Section VIII without violating these

requirements, Defendant shall document such conflicts and notify the Commission and the Bureau that it intends to comply with these requirements to the extent possible.

*Provided further that*, nothing in this Section VIII shall be interpreted to (1) limit or restrict in any way the protections provided to borrowers under the Bureau's rules relating to loss mitigation (12 C.F.R. §§ 1024.41, *et seq.*), or to (2) require Defendant to communicate with a borrower in a manner otherwise prohibited by applicable law, including bankruptcy law or the federal Fair Debt Collection Practices Act or any similar debt-collection-related state law.  To the extent any provision of this Section VIII is in conflict with any provision of 12 C.F.R. § 1024.41, 12 C.F.R. § 1024.41 shall apply.

## IX.   INJUNCTION AGAINST FALSE OR MISLEADING REPRESENTATIONS

**IT IS FURTHER ORDERED** that Defendant, Defendant's officers, agents, and employees, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

A.    Making any material misrepresentation or assisting others in making any material misrepresentation, expressly or by implication, including but not limited to misrepresentations:

1.    That consumers' loans have certain unpaid balances, payment due dates, interest rates, monthly payment amounts, delinquency

statuses, and unpaid fees or other amounts due;

2.      That consumers must make payments under the original, unmodified

loan terms when a consumer has an in-process loan modification or

other loss mitigation agreement from the prior servicer;

3.      That consumers have to make a payment on their loans before

Defendant will consider them for a loan modification;

4.      That Defendant will review and respond to consumers' requests to

be considered for a short sale in a set time period;

5.      The existence and length of any "grace period" in consumers'

promissory notes; and

6.      That a payment method that entails a convenience fee is the only

payment method available or only payment method that consumers

can use to make timely payments.

7.      Nothing in this provision shall be interpreted to preclude Defendant

from accurately representing for informational purposes contractual

amounts that remain due and owing until a permanent loan

modification has been finalized, provided that such representation

does not mislead a consumer regarding the amounts due under the

modification.

B.      Failing, in communications between Defendant and consumers about

Speedpay or other payment methods that involve a convenience fee, to disclose to

consumers truthfully, clearly and prominently, and before the consumers agree to pay

through Speedpay or any other payment method that entails a convenience fee:

> 1.  That consumers will be charged a convenience fee; and
>
> 2.  The existence of other payment methods that do not entail a
>     convenience fee.

## X.   INJUNCTION AGAINST UNAUTHORIZED WITHDRAWALS

**IT IS FURTHER ORDERED** that Defendant, Defendant's officers, agents, and

employees, and all other persons in active concert or participation with any of them, who

receive actual notice of this Order, whether acting directly or indirectly, are permanently

restrained and enjoined from causing payments to be taken from consumers' bank

accounts without having previously obtained consumers' consent for any and all such

payments.

## XI.   INJUNCTION AGAINST UNLAWFUL COLLECTION PRACTICES

**IT IS FURTHER ORDERED** that Defendant, Defendant's officers, agents, and

employees, and all other persons in active concert or participation with any of them, who

receive actual notice of this Order, whether acting directly or indirectly, in connection

with collecting on past-due debt, are permanently restrained and enjoined from:

> A.  When communicating with any person other than the consumer for the

purpose of acquiring location information about the consumer:

1.  Stating that a consumer owes a debt;

2.  Communicating more than once with any such person unless the person requests that the Defendant communicate with him or her again or Defendant has a reasonable belief that the person's denial of knowledge of the consumer or the consumer's location in response to Defendant's first location communication was erroneous or incomplete and the person now has correct or complete location information;

3.  Failing to create records documenting that any such person informs Defendant, either orally or in writing, that the consumer that Defendant is trying to contact cannot be reached at that telephone number or the person does not have location information about the consumer that Defendant is trying to reach, and failing to maintain these records for at least five years from the date of last contact with the consumer; and

4.  Failing to create records documenting that Defendant had a reasonable belief that a person's statement that the consumer Defendant is trying to contact cannot be reached at that telephone number, or that the person does not have location information about

the consumer, was erroneous, incomplete, or out of date, before

calling that telephone number again, and failing to maintain these

records for at least five years from the date of last contact with the

consumer.   ***Provided that***, for purposes of this Section XI.A, to

have a "reasonable belief" that a person's earlier statements were

erroneous or incomplete and that such person now has correct or

complete location information, Defendant must have: (1) conducted

a thorough review of all applicable records, documents, and database

entries for the consumer Defendant is trying to reach to search for

any notations that indicate that the consumer cannot be reached at

that telephone number or that the person does not have location

information about the consumer Defendant is trying to reach; and (2)

obtained and considered additional information or evidence beyond

the information or evidence previously relied upon by Defendant in

attempting to contact the consumer Defendant is trying to reach, and

such additional information or evidence substantiates Defendant's

belief that the person's earlier statements were erroneous or

incomplete and that such person now has correct or complete

location information;

B.     Communicating, except when seeking to acquire location information in

compliance with Section 804 of the FDCPA, 15 U.S.C. § 1692b, with any person other than the consumer, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, the attorney of the debt collector, the consumer's spouse, the consumer's parent (if the consumer is a minor), the consumer's guardian, the consumer's executor, the consumer's administrator, or the consumer's attorney, in connection with collecting on past-due debt, unless Defendant has the prior consent of the consumer given directly to Defendant or the express permission of a court of competent jurisdiction, or Defendant can show that such communication is reasonably necessary to effectuate a post-judgment judicial remedy;

      C.     With regard to the time and place of communications:

           1.     Communicating with a consumer in connection with collecting on past-due debt at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer.  This includes communicating with a consumer before 8 a.m. or after 9 p.m. at the consumer's location, as evidenced by the consumer's zip code and the area code of the consumer's telephone number, unless the Defendant has knowledge that such hours are convenient for the consumer.  This also includes communicating with a consumer at a particular time or place after anyone at the telephone number has informed Defendant, either orally or in writing, that it is

Page 44 of 65

inconvenient for the consumer to receive calls at that particular time or place;

2.    Communicating with the consumer at the consumer's place of employment if the Defendant knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication; and

3.    Failing to create and maintain (for at least five years from the date of last contact with the consumer) records documenting that a consumer has informed Defendant, either orally or in writing, that it is inconvenient for the consumer to receive calls at a particular time or place, or that the consumer is prohibited from receiving calls from Defendant at the consumer's place of employment;

D.    Engaging in conduct the natural consequence of which is to harass, oppress, or abuse a person, including, but not limited to: (1) the use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader; or (2) causing a telephone to ring, or engaging a person in telephone conversation, repeatedly or continuously with the intent to annoy, abuse, or harass the person at the called number. ***Provided that***, for purposes of this Section XI.D, there shall exist a rebuttable presumption of an intent to annoy, harass, or abuse if Defendant places more than one call to any person about a debt after that person has notified Defendant in

writing that the person refuses to pay such debt or that the person wishes Defendant to cease further communication with the person; except that Defendant may communicate to advise the person that further debt collection efforts are being terminated, that Defendant may invoke specified remedies which are ordinarily invoked by debt collectors and creditors, or, where applicable, that Defendant intends to invoke a specified remedy.

*Provided further that*, after a borrower has sent Defendant a notification pursuant to FDCPA section 805(c) nothing in this Section XI.D shall prevent Defendant from providing the written notice required by 12 C.F.R. § 1024.39(b) if loss mitigation options are available. *Provided further that*, when a consumer orally requests that Defendant cease further communication regarding a debt, Defendant shall (i) provide the consumer orally and contemporaneously with instructions for submitting the request in writing; and (ii) within 14 days of the consumer orally requesting that Defendant cease further communication, provide the consumer clear and conspicuous written instructions on how to submit the request in writing;

E.     Using any false, deceptive, or misleading representation or means, including but not limited to falsely representing, directly or indirectly, expressly or by implication: (1) the character, amount, or legal status of any debt; or (2) that nonpayment of a debt will result in the arrest or imprisonment of consumers or the seizure, garnishment, attachment, or sale of the consumers' property or wages, when in fact such action is not lawful or Defendant does not intend to take such action;

F.      Using any unfair or unconscionable means to collect or attempt to collect any debt, including but not limited to collecting any amount unless such amount is expressly authorized by the agreement creating the debt or permitted by law; and

G.      Violating any provision of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p (a copy of which is attached hereto as Attachment A), including, but not limited to: (1) Sections 804(2)-(3), 15 U.S.C. §§ 1692b(2)-(3); (2) Section 805(a), 15 U.S.C. § 1692c(a); (3) Section 805(b), 15 U.S.C. § 1692c(b); (4) Section 806, 15 U.S.C. § 1692d; (5) Section 807, 15 U.S.C. § 1692e; and (6) Section 808, 15 U.S.C. § 1692f.

## XII.   INJUNCTION AGAINST UNLAWFUL CONSUMER REPORTING PRACTICES

**IT IS FURTHER ORDERED** that Defendant, Defendant's officers, agents, and employees, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

A.      Furnishing information relating to any consumer to a consumer reporting agency, notwithstanding any alternative compliance methods that may be generally available under Section 623(a)(1)(C) of the FCRA, 15 U.S.C. § 1681s-2(a)(1)(C), if:

1.      Defendant knows or has reasonable cause to believe that the information is inaccurate; or

2.      Defendant has been notified by the consumer, at the address

specified by Defendant for such notices, that specific information is

inaccurate, and the information is, in fact, inaccurate;

B.      Upon determining that the information Defendant furnished to a consumer

reporting agency about a consumer is not complete and accurate:

1.      Failing to promptly notify the consumer reporting agency that

Defendant has determined the information is not complete and

accurate;

2.      Failing to provide to the consumer reporting agency any corrections

to that information, or any additional information, that is necessary

to make the information provided by the Defendant to the agency

complete and accurate; and

3.      Furnishing to the agency thereafter any of the information that

remains incomplete or inaccurate;

C.      If the completeness or accuracy of any information about a consumer

furnished by Defendant to any consumer reporting agency is disputed to Defendant by a

consumer or Defendant is notified by a consumer reporting agency under 15 U.S.C.

§ 1681i(a)(2) that a consumer has disputed information furnished by Defendant,

furnishing the information to any consumer reporting agency without notice that such

information is disputed by the consumer; and

D.      Violating any provision of the Fair Credit Reporting Act, 15 U.S.C.

§§ 1681-1681x (a copy of which is attached hereto as Attachment B), including, but not

limited to: (1) Section 623(a)(1), 15 U.S.C. § 1681s-2(a)(1); (2) Section 623(a)(2), 15

U.S.C. § 1681s-2(a)(2); and (3) Section 623(a)(3), 15 U.S.C. § 1681s-2(a)(3), in

connection with furnishing information about a consumer to a consumer reporting

agency.

## XIII.  INJUNCTION AGAINST UNLAWFUL REAL ESTATE SETTLEMENT PROCEDURES

**IT IS FURTHER ORDERED** that Defendant, Defendant's officers, agents, and

employees, and all other persons in active concert or participation with any of them, who

receive actual notice of this Order, whether acting directly or indirectly, in connection

with the servicing of any loan, are permanently restrained and enjoined from:

A.      Failing to timely acknowledge receipt of, and respond to, consumers'

qualified written requests;

B.      Failing to protect any consumer's credit rating by providing adverse

information to a consumer reporting agency regarding any payment that is the subject of

a notice of error or qualified written request for sixty (60) days after receipt of the

qualified written request;

C.      Failing to make timely payments from consumers' escrow accounts for

casualty insurance, property taxes, and other charges with respect to the property, when

the loan is escrowed for such amounts; and

D.      Violating the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605 (a

copy of which is attached hereto as Attachment C), or its implementing Regulation X, 12

C.F.R. §§ 1024.35 and 1024.17(k) (a copy of which is attached hereto as Attachment D).

## XIV.   COMPLIANCE WITH EXISTING LAW

**IT IS FURTHER ORDERED** that nothing in this Order affects Defendant's

obligation to comply with applicable law, implementing regulations, including but not

limited to all applicable provisions of the FDCPA, FCRA, provisions of the accuracy and

integrity requirements of the Furnisher Rule, 12 C.F.R. § 1022.42 and Appendix A,

RESPA, and the Bureau's rules relating to mortgage servicing (12 C.F.R. § 1024.30, *et*

*seq.*).

## XV.   CONSUMER INFORMATION

**IT IS FURTHER ORDERED** that Defendant, Defendant's officers, agents, and

employees, and all other persons in active concert or participation with any of them, who

receive actual notice of this Order, whether acting directly or indirectly, are permanently

restrained and enjoined from failing to provide sufficient consumer information to enable

the Bureau to efficiently administer consumer redress.  If a representative of the Bureau

requests in writing any information related to redress, Defendant must provide it, in the

form prescribed by the Bureau, within 21 days.

## XVI.   NOTICE REQUIREMENTS

**IT IS FURTHER ORDERED** that:

A.     For a period of 5 years from the date of entry of this Order, Defendant, whether acting directly or indirectly, shall on a quarterly basis make the following disclosure in writing indicating clearly and conspicuously  to consumers with past-due debts serviced by Defendant:

> Federal and state law prohibit certain methods of debt collection, and require that we treat you fairly.
>
> If you have a complaint about the way we are collecting this debt, please write to our CONTACT CENTER, [current physical address], email us at [current email address], or call us toll-free at [current phone number] between 9:00 A.M. and 5:00 P.M. Central Time Monday - Friday.
>
> The Federal Trade Commission and the Consumer Financial Protection Bureau enforce the Fair Debt Collection Practices Act.  If you have a complaint about the way we are collecting your debt, please contact the FTC or the CFPB.  You can reach the FTC online at www.ftc.gov/complaint; by phone at 1-877- FTC-HELP; or by mail at 600 Pennsylvania Ave., NW, Washington, DC 20580.  You can reach the CFPB online at www.consumerfinance.gov/complaint; by phone at 1-855-411-2372; or by mail at Consumer Financial Protection Bureau P.O. Box 4503, Iowa City, Iowa 52244.

The above disclosure shall be given in the language(s) that appear in such communications sent to consumers.  Defendant shall be responsible for sending the initial, quarterly written notice in accordance with the requirement in this Section XVI.A

thirty (30) days after entry of this Order, or, for loans acquired after entry of this Order, within thirty (30) days of acquisition.

B.      Defendant shall be deemed to have complied with the notice requirement of Section XVI.A of this Order if Defendant provides a notice in a specific federal, state, county, or city jurisdiction that (1) is required by the laws or regulations of that jurisdiction, (2) complies with those laws or regulations, and (3) is substantially similar to the notice required in Section XVI.A, above.

C.      Defendant, whether acting directly or indirectly, shall provide a written (electronic or paper) copy of the following notice to all officers, agents, and employees having responsibility with respect to collecting on past-due debts, within thirty (30) days of the date of entry of this Order, and to each employee hired for a period of five (5) years after that date, no later than the time the employee assumes responsibility with respect to the collecting on past-due debts, and shall secure from each such person, within forty-five (45) days of delivery, a signed and dated statement acknowledging that he or she has read the notice.

> Debt collectors must comply with the federal Fair Debt Collection Practices Act, which limits our activities in trying to collect money from consumers.
>
> Section 804 of the Act says that, when contacting someone to acquire location information about the consumer, you may not state that the consumer owes a debt.  You also may not contact this person more than once unless the person asks you to or unless you reasonably believe the person's earlier

response was wrong or incomplete and that the person now has correct or complete location information to provide to you.

Section 805 of the Act says that, in connection with collecting on past-due debts, you may not communicate with any person other than the consumer for a purpose other than to obtain location information about the consumer.  This means that you may not reveal the existence of a debt to anyone other than:  (1) the person who allegedly owes the debt; (2) the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator; or (3) the consumer's attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or Green Tree's attorneys.

Section 805 of the Act also says that you may not communicate with a consumer in connection with collecting on past-due debts: (1) at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer; or (2) at the consumer's place of employment if you know or have reason to know that the employer prohibits the consumer from receiving such communication.

If a consumer notifies you either orally or in writing that the consumer refuses to pay a debt or that the consumer wishes us to cease further communication with the consumer, you shall not communicate further with the consumer with respect to such debt, except: (1) to advise the consumer that our further efforts are being terminated; (2) to notify the consumer that we or the owner of the loan may invoke specified remedies which are ordinarily invoked by debt collectors or creditors; (3) where applicable, to notify the consumer that we or the owner of the loan intends to invoke a specified remedy; or (4) to place one additional call to confirm that the consumer is not interested in loss mitigation.

Section 806 of the Act states that you may not harass, oppress, or abuse any person in connection with collecting on

past-due debts.  Among other things, this includes calling
someone repeatedly or continuously to annoy, abuse, or
harass the person, and using obscene or profane language, or
language that is likely to abuse the person.

Section 807 of the Act prohibits the use of any false
representation or deceptive means to collect or attempt to
collect any debt or to obtain information about a consumer.

Individual debt collectors are liable for their violations of the
Act, and may be required to pay penalties if they violate it.

***Provided that***, for purposes of compliance with Section XVI.C of this Order, the

signature required for the employee's statement that he or she has read the notice may be

in the form of an electronic signature.

## XVII. ACKNOWLEDGMENTS OF ORDER
## AND RELEVANT STATUTES

**IT IS FURTHER ORDERED** that Defendant obtain acknowledgments of receipt

of this Order and of the FDCPA, the FCRA, and RESPA, in their current codification or

as they may hereafter be amended:

A.      Defendant, within seven (7) days of entry of this Order, must submit to the

Commission and the Bureau an acknowledgment of receipt of this Order sworn under

penalty of perjury.

B.      For five (5) years after entry of this Order, Defendant must deliver a copy

of this Order and the FDCPA (attached hereto as Attachment A) to:  (1) all principals,

officers, directors, and LLC managers and members; (2) all employees, agents, and

representatives who participate in collecting on past-due debts; and (3) any business entity resulting from any change in structure as set forth in the Section XVIII of this Order.  Delivery must occur within seven (7) days of entry of this Order for current personnel.  To all others, delivery must occur before they assume their responsibilities. In addition, if the FDCPA is amended within five (5) years after entry of this Order, Defendant must deliver an amended copy of the FDCPA to current personnel who participate in collecting on past-due debts within thirty (30) days after it is amended.

C.     For five (5) years after entry of this Order, Defendant, must deliver a copy of this Order and the FCRA (attached hereto as Attachment B) to:  (1) all principals, officers, directors, and LLC managers and members; (2) all employees, agents, and representatives who participate in furnishing or reporting information relating to any consumer to any consumer reporting agency; and (3) any business entity resulting from any change in structure as set forth in the Section XVIII of this Order.  Delivery must occur within seven (7) days of entry of this Order for current personnel.  To all others, delivery must occur before they assume their responsibilities.  In addition, if the FCRA is amended within five (5) years after entry of this Order, Defendant must deliver an amended copy of the FCRA to current personnel who participate in furnishing or reporting information relating to consumers to any consumer reporting agency within thirty (30) days after it is amended.

D.     For five (5) years after entry of this Order, Defendant, must deliver a copy

of this Order and RESPA (attached hereto as Attachment C) to: (1) all principals,

officers, directors, and LLC managers and members; (2) all employees, agents, and

representatives who participate in paying property taxes, receiving or responding to

notices of error or qualified written requests, or furnishing or reporting information

relating to any consumer to any consumer reporting agency; and (3) any business entity

resulting from any change in structure as set forth in the Section XVIII of this Order.

Delivery must occur within seven (7) days of entry of this Order for current personnel.

To all others, delivery must occur before they assume their responsibilities. In addition,

if RESPA is amended within five (5) years after entry of this Order, Defendant must

deliver an amended copy of RESPA to current personnel who participate in paying

property taxes, receiving or responding to notices of error or qualified written requests, or

furnishing or reporting information relating to any consumer reporting agency within

thirty (30) days after it is amended.

      E.    From each individual or entity to which Defendant delivered a copy of this

Order, Defendant must obtain, within thirty (30) days, a signed and dated

acknowledgment of receipt of this Order and of any additional materials received

pursuant to this Section of the Order, including copies of the FDCPA, FCRA, or RESPA.

## XVIII.      COMPLIANCE REPORTING

      **IT IS FURTHER ORDERED** that Defendant make timely submissions to the

Commission:

A.     One (1) year after entry of this Order, Defendant must submit a compliance

report to the Commission, sworn under penalty of perjury:

1.     Defendant must:  (a) identify the primary physical, postal, and email

address and telephone number, as designated points of contact,

which representatives of the Commission and Bureau may use to

communicate with Defendant; (b) identify all of Defendant's

businesses by all of their names, telephone numbers, and physical,

postal, email, and Internet addresses; (c) describe the activities of

each business, including the goods and services offered, the means

of advertising, marketing, and sales, and the involvement of any

other Defendant; (d) describe in detail whether and how Defendant

is in compliance with each Section of this Order; and (e) provide a

copy of each Order Acknowledgment obtained pursuant to this

Order, unless previously submitted to the Commission.

B.     For fifteen (15) years following entry of this Order, Defendant must submit

a compliance notice to the Commission, sworn under penalty of perjury, within 14 days

of any change in the following: (1) any designated point of contact; or (2) the structure of

Defendant or any entity that Defendant has any ownership interest in or directly or

indirectly controls that may affect compliance obligations arising under this Order,

including:  creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or

affiliate that engages in any acts or practices subject to this Order.  The Commission will provide a copy of such notice to the Bureau.

C.      Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or any similar proceeding by or against such Defendant within fourteen (14) days of its filing.  The Commission will provide a copy of such notice to the Bureau.

D.      Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:  "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on:_____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.      Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to:  Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580.  The subject line must begin: *Federal Trade Commission and Consumer Financial Protection Bureau v. Green Tree Servicing LLC,* No. XXXX.

F.      Unless otherwise directed by a Bureau representative in writing, all submissions to the Bureau pursuant to this Order must be emailed to

Compliance@cfpb.gov or sent by the U.S. Postal Service to:  Assistant Director for

Enforcement, Consumer Financial Protection Bureau, ATTENTION: Office of

Enforcement 1700 G Street, NW, Washington D.C. 20552.  For overnight courier send

to: Assistant Director for Enforcement, Consumer Financial Protection Bureau,

ATTENTION: Office of Enforcement 1625 I Street, 4th Floor, NW, Washington, D.C.

20006. The subject line must begin:  *In re* Green Tree Servicing, LLC, File No. XXXX

2014-CFPB-Docket # XXXX.

## XIX.   RECORDKEEPING

**IT IS FURTHER ORDERED** that Defendant must create certain records for

fifteen (15) years after entry of the Order, and retain each such record for 5 years, unless

otherwise indicated.  Specifically, Defendant must create and retain the following

records:

A.      Accounting records maintained in accordance with generally accepted

accounting principles in effect from time to time in the United States of America,

including records showing the revenues from all goods or services sold, all costs incurred

in generating those revenues, and the resulting net profit or loss;

B.      Personnel records showing, for each person providing services, whether as

an employee or otherwise, that person's:  name, addresses, and telephone numbers; job

title or position; dates of service; and, if applicable, the reason for termination;

C.      Consumer files containing the names, last known addresses and phone

numbers as of the date Defendant ceased servicing activity, dollar amounts of debt owed,

when Defendant serviced the loan, records of Defendant's collection activity, and

amounts collected by Defendant;

D.     For every consumer complaint to Defendant, whether received directly,

indirectly, or through a third party, records that include:

1.     Any complaint and the date received, and the nature of the complaint

as reflected in any notes, logs, or memoranda, including a

description of the conduct alleged; and

2.     The basis of the complaint, including the names of any collectors,

customer service representatives, or supervisors complained about;

the nature of any research conducted concerning the validity of any

complaint; all documents relating to the disposition of the complaint,

including records of all contacts with the consumer; Defendant's

response to the complaint and the response date; whether the

complaint was resolved; the date of resolution; and any action taken

to correct the conduct complained about.

E.     Copies of all scripts and other training materials related to the collection of

debts;

F.     To the extent permitted by state law, tape recordings of the complete

telephone conversation for at least ninety (90) percent of all telephone calls between

Defendant and anyone it contacts in collecting on past-due debts, provided that

Defendant must commence making such recordings no later than three (3) months after

the date of this Order and must maintain these recordings for two (2) years after they are

made;

G.    To the extent permitted by state law, tape recordings of the complete

telephone conversation for at least ninety (90) percent of all calls in which consumers

consent to payment using Speedpay or any other payment method initiated by Defendant

in which a convenience fee is charged, provided that Defendant must commence making

such recordings no later than three (3) months after the date of this Order and must

maintain these recordings for two (2) years after they are made; and

H.    All records and documents necessary to demonstrate full compliance with

each provision of this Order, including procedures for responding to consumer

complaints, documents related to investigations of consumer complaints, all required

acknowledgments, notices, and all submissions to the Commission or Bureau.

## XX.   COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Defendant's

compliance with this Order:

A.    Within fourteen (14) days of receipt of a written request from a

representative of the Commission or Bureau, Defendant must: submit additional

compliance reports or other requested information, which must be sworn under penalty of

perjury; appear for depositions; and produce documents, for inspection and copying.  The

Commission and Bureau are also authorized to obtain discovery, without further leave of

court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30

(including telephonic depositions), 31, 33, 34, 36, 45, and 69, ***provided that***, Defendant,

after attempting to resolve a dispute without court action and for good cause shown, may

file a motion with this Court seeking an order for one or more of the protections set forth

in Federal Rule of Civil Procedure Rule 26(c).

B.      For matters concerning this Order, the Commission and Bureau are

authorized to communicate directly with Defendant.  Defendant must permit

representatives of the Commission or Bureau to interview any employee or other person

affiliated with Defendant who has agreed to such an interview.  The person interviewed

may have counsel present.

C.      The Commission and Bureau may use all other lawful means, including

posing, through their respective representatives, as consumers, suppliers, or other

individuals or entities, to Defendant or any individual or entity affiliated with Defendant,

without the necessity of identification or prior notice.  Nothing in this Order limits the

Commission's or Bureau's lawful use of compulsory process, pursuant to Sections 9 and

20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1, or Section 1052 of the CFPA, 12 U.S.C. §

5562.

***Provided that***, consistent with the Memorandum of Understanding between the Commission and the Bureau, Plaintiffs shall endeavor to coordinate enforcement of their rights under this Order to minimize duplication of efforts and burden on Defendant.

## XXI.  RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that although this action will be dismissed, this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

SO ORDERED this 23<u>rd</u>  day of <u>April</u>, 2015.


<u>s/Susan Richard Nelson</u>
SUSAN RICHARD NELSON
United States District Court Judge

**FOR PLAINTIFFS:**

_(signature)_

LISA ROTHFARB
Maryland Bar
DANIEL DWYER
California Bar No.286701
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C.  20580
Tel: (202) 326-2602
Fax: (202) 326-3768

Date: 4/21/2015

_(signature)_

JAMES SUGARMAN
Washington Bar No. 39107
KIRSTEN IVEY-COLSON
Washington, DC Bar No. 470102
Consumer Financial Protection Bureau
1700 G Street NW
Washington. DC 20552
Tel: (202) 435-7493
Fax: (202) 435-7722

**FOR DEFENDANT GREEN TREE SERVICING LLC**

THOMAS J. FRANCO
President
Green Tree Servicing LLC
345 St. Peter Street
St. Paul, MN 55102

Date: 2/20/15

| | |
|---|---|
| STEVEN M. KAPLAN | ELIZABETH L. MCKEEN |
| Washington, DC Bar No. 447308 | California Bar No. 216690 |
| K&L Gates LLP | O'Melveny & Myers LLP |
| 1601 K Street NW | 610 Newport Center Dr., Ste 1700 |
| Washington, DC 20006-1600 | Newport Beach, CA 92660 |
| Tel: (202) 778-9204 | Tel: (949) 823-7150 |

Date: _____

Date: _____

**FOR DEFENDANT GREEN TREE SERVICING LLC**

_____

THOMAS J. FRANCO
President
Green Tree Servicing LLC
345 St. Peter Street
St. Paul, MN 55102

Date: _____

_____
STEVEN M. KAPLAN
Washington, DC Bar No. 447308
K&L Gates LLP
1601 K Street NW
Washington, DC 20006-1600
Tel: (202) 778-9204

Date: _2/20/15_

_____
ELIZABETH L. MCKEEN
California Bar No. 216690
O'Melveny & Myers LLP
610 Newport Center Dr., Ste 1700
Newport Beach, CA 92660
Tel: (949) 823-7150

Date: _____

**FOR DEFENDANT GREEN TREE SERVICING LLC**

_____

THOMAS J. FRANCO
President
Green Tree Servicing LLC
345 St. Peter Street
St. Paul, MN 55102

Date: _____


_____

STEVEN M. KAPLAN
Washington, DC Bar No. 447308
K&L Gates LLP
1601 K Street NW
Washington, DC 20006-1600
Tel: (202) 778-9204

ELIZABETH L. MCKEEN
California Bar No. 216690
O'Melveny & Myers LLP
610 Newport Center Dr., Ste 1700
Newport Beach, CA 92660
Tel: (949) 823-7150

Date: _____

Date: _2/20/15_

# EXHIBIT B

ANNE ARUNDEL COUNTY CIRCUIT COURT (Land Records) RPD 19067 p. 0181 MSA_CE58_19411. Date available 05/25/2007. Printed 02/12/2018

I hereby certify that this instrument has been prepared by:

_James E. Mitchell, III [Signature]_

[X] under the supervision of the above signed Maryland Attorney.

[ ] one of the parties named in this instrument.

After recording please return to:

Smartertitle.com, LLC
5885 Trinity Parkway #130
Centreville, VA 20120

Tax ID# 504712679500
File # 0721706

*[Space Above This Line For Recording Data]*

Loan Number: 3143594

[ ] "X" Box if "Purchase Money Deed of Trust"

# DEED OF TRUST

MIN: 100162500031435941

WS FD SURE $        20.00
RECORDING FEE        20.00
RECORDATION T        94.50
TOTAL               134.50
indexing 3, Rdst $ 98410
Blk # 1798
May 09, 2007     02:46 PM

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)    "Security Instrument" means this document, which is dated **April 12, 2007**, together with all Riders to this document.

(B)    "Borrower" is Lisa A Andersen.  Borrower is the trustor under this Security Instrument.

(C)    "Lender" is **Ohio Savings Bank**.  Lender is a **Federal Savings Bank** organized and existing under the laws of The United States of America.  Lender's address is **1801 East Ninth Street Suite 200, Cleveland, OH 44114**.

(D)    "Trustee" is
Smartertitle.com, LLC
5885 Trinity Parkway #130
Centreville, VA 20120

(E)    "MERS" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  **MERS is the beneficiary under this Security Instrument.**  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

RECEIVED FOR RECORD
CIRCUIT COURT FOR A A COUNTY
2007 MAY -9 P 3: 16

---

(F) **"Note"** means the promissory note signed by Borrower and dated **April 12, 2007.** The Note states that Borrower owes Lender **One Hundred Eleven Thousand and 00/100ths** Dollars (U.S. **$111,000.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **May 1, 2037.**

(G) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(H) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Revocable Trust Rider | |
| ☒ Other(s) *[specify]* **Affidavit of Consideraton(Non-Purchase Money Transaction) (MD)** | | |

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

ANNE ARUNDEL COUNTY CIRCUIT COURT (Land Records) RPD 19067, p. 0182, MSA_CE59_19411. Date available 05/25/2007. Printed 02/14/2018.

## EXHIBIT "A"

BEGINNING FOR THE SAME ON THE SOUTHWEST SIDE OF EDGEVALE ROAD AT THE DISTANCE OF ONE HUNDRED FEET NORTHWESTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE SOUTHWEST SIDE OF EDGEVALE ROAD WITH THE NORTHWEST SIDE OF LEVIN ROAD, AND RUNNING THENCE NORTHWESTERLY BINDING ON THE SOUTHWEST SIDE OF EDGEVALE ROAD TWENTY-SIX AND FOUR TENTHS FEET TO A POINT IN LINE WITH THE CENTER LINE OF A PARTITION WALL BETWEEN THE HOUSE ON THE LOT NOW BEING DESCRIBED AND THAT ADJOINING ON THE NORTHWEST THENCE SOUTHWESTERLY TO AND THROUGH THE CENTER OF SAID WALL TO THE END THEREOF AND CONTINUING THE SAME COURSE IN ALL ONE HUNDRED TWENTY FEET TO AN ALLEY FIFTEEN FEET WIDE THENCE SOUTHEASTERLY BINDING THEREON WITH THE USE THEREOF IN COMMON WITH OTHERS TWENTY-SIX AND FOUR-TENTHS FEET TO INTERSECT A LINE DRAWN FROM THE PLACE OF BEGINNING SOUTHWESTERLY PARALLEL WITH LEVIN ROAD AND THENCE NORTHEASTERLY REVERSING SAID LINE AND BOUNDING THEREON ONE HUNDRED TWENTY FEET TO THE PLACE OF BEGINNING.  THE IMPROVEMENTS KNOWN AS 205 W. EDGEVALE ROAD, BROOKLYN PARK.

BEING THE SAME PROPERTY CONVEYED UNTO LISA A. ANDERSEN BY DEED FROM JACK E. FOX, JR. AND SHELBY L. FOX, TENANTS BY THE ENTIRETY DATED 4/29/2004 AND RECORDED ON 6/3/2004 IN BOOK 14905, PAGE 27, ANNE ARUNDEL COUNTY, STATE OF MARYLAND.

TAX ID:  504712679500

Escrow File No.:  0721706

3

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of Baltimore city:

    *[Type of Recording Jurisdiction]*       *[Name of Recording Jurisdiction]*
   **See Attached Exhibit A**

which currently has the address of 205 W edgevale rd
                                  *[Street]*

      **Brooklyn,**          Maryland **21225**                ("Property Address"):
       *[City]*               *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be

ANNE ARUNDEL COUNTY CIRCUIT COURT (Land Records) RPD 19067, p. 0184, MSA_CE59_19411. Date available 06/25/2007. Printed 02/12/2018.

made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any

Maryland Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—          Page 4 of 13
www.compliancesource.com

MERS Modified Form 3021 01/01 (rev. 10/01)
14301MD 10/01 Rev. 10/04
©2004, The Compliance Source, Inc.
3143594

time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remapping or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

Maryland Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—   Page 5 of 13   6
www.compliancesource.com

MERS Modified Form 3021 01/01 (rev. 10/01)
14301MD 10/01 Rev. 10/04
©2004, The Compliance Source, Inc.
3143594

ANNE ARUNDEL COUNTY CIRCUIT COURT (Land Records) RPD 19067, p 0186 MSA_CE59_19411 Date available 05/25/2007 Printed 02/12/2018

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has

Maryland Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 6 of 13

MERS Modified Form 3021 01/01 (rev. 10/01)
1430IMD 10/01 Rev. 10/04
©2004, The Compliance Source, Inc.
3143594

released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable

loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise

Maryland Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
---THE COMPLIANCE SOURCE, INC.— Page 8 of 12  9
www.compliancesource.com

MERS Modified Form 3021 01/01 (rev. 10/01)
14301MD 10/01 Rev. 10/04
©2004, The Compliance Source, Inc.
3143594

ANNE ARUNDEL COUNTY CIRCUIT COURT (Land Records), RPD 19067, p. 0189, MSA_CE59_19411. Date available 05/25/2007. Printed 02/12/2018.

agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment

Maryland Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 9 of 18

MERS Modified Form 3021 01/01 (rev. 10/01)
14301MD 10/01 Rev. 10/04
©2004, The Compliance Source, Inc.
3143594

without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall

Maryland Deed of Trust-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 10 of 13

MERS Modified Form 3021 01/01 (rev. 10/01)
14301MD 10/01 Rev. 10/04
©2004, The Compliance Source, Inc.

3143594

continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary,

Maryland Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 11 of 12

MERS Modified Form 3021 01/01 (rev. 10/01)
14301MD 10/01 Rev. 10/04
©2004, The Compliance Source, Inc.
3143594

ANNE ARUNDEL COUNTY CIRCUIT COURT (Land Records) RP 1 9067, p. 0192, MSA_CE59_19411. Date available 06/25/2007. Printed 02/12/2018.

Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale, assent to decree, and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall mail or cause Trustee to mail a notice of sale to Borrower in the manner prescribed by Applicable Law. Trustee shall give notice of sale by public advertisement and by such other means as required by Applicable Law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale and by notice to any other persons as required by Applicable Law. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of 5.00% of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

Borrower, in accordance with Title 14, Chapter 200 of the Maryland Rules of Procedure, does hereby declare and assent to the passage of a decree to sell the Property in one or more parcels by the equity court having jurisdiction for the sale of the Property, and consents to the granting to any trustee appointed by the assent to decree of all the rights, powers and remedies granted to the Trustee in this Security Instrument together with any and all rights, powers and remedies granted by the decree. Neither the assent to decree nor the power of sale granted in this Section 22 shall be exhausted in the event the proceeding is dismissed before the payment in full of all sums secured by this Security Instrument.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender or Trustee, shall release this Security Instrument and mark the Note "paid" and return the Note to Borrower. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the city or county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Possession of the Property.** Borrower shall have possession of the Property until Lender has given Borrower notice of default pursuant to Section 22 of this Security Instrument.

Maryland Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 12 of 13

MERS Modified Form 3021 01/01 (rev. 10/01)
1430IMD 10/01 Rev. 10/04
©2004, The Compliance Source, Inc.
3143594

ANNE ARUNDEL COUNTY CIRCUIT COURT (Land Records) RPD 19067, p. 0193, MSA_CE59_19411. Date available 05/25/2007. Printed 02/12/2018.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
Lisa Andersen                    -Borrower
                                 *[Printed Name]*

_____ (Seal)
                                 -Borrower
                                 *[Printed Name]*

_____ (Seal)
                                 -Borrower
                                 *[Printed Name]*

_____ (Seal)
                                 -Borrower
                                 *[Printed Name]*

————————*[Space Below for Acknowledgment]*————————

State of Maryland §
County of ~~Baltimore city~~ Anne Arundel §, to wit:
(or City of Baltimore) §

    I hereby certify, that on this *12* day of *April* in the year *2007*, before the subscriber, a Notary Public, personally appeared Lisa Andersen *[name of person making acknowledgment]*, and did each acknowledge the foregoing deed to be his/her/their respective act.

My Commission Expires:

_____
Notary Public

ARTHUR S. WALSH
NOTARY PUBLIC
CARROLL COUNTY
STATE OF MARYLAND

ARTHUR S. WALSH
NOTARY PUBLIC STATE OF MARYLAND
Print Name: My Commission Expires September 25, 2007

Maryland Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 13 of 14

MERS Modified Form 3021 01/01 (rev. 10/01)
1430IMD 10/01 Rev. 10/04
©2004, The Compliance Source, Inc.
3143594

# EXHIBIT C

 **ditech**®

PO Box 6172, Rapid City, SD 57709-6172

5-776-05542-0000403-001-1-001-000-000-000

 LISA ANDERSEN
205 W EDGEVALE RD
BROOKLYN MD 21225-2636

# BILLING STATEMENT

| Statement Date | Due Date | **Amount Due** |
|---|---|---|
| 10/12/2016 | 11/01/2016 | **$10,279.15** |

**If payment is received after 11/16/2016,
a $14.86 late fee will be charged**

 AutoPay is Free Online at Ditech.com

 Mail your payment to
PO Box 94710
Palatine, IL 60094-4710

 Call 1-800-643-0202
Monday - Friday, 7a.m. - 8 p.m. CST
Saturday, 7a.m. - 1 p.m. CST

## Account Information

| | |
|---|---|
| Loan Number | 0050486802 |
| Principal Balance † | $92,141.26 |
| Escrow Balance | ($7,771.44) |
| Deferred Balance | $10,349.84 |
| Advance Balance ^ | $884.22 |
| Funds in Suspense Balance | $25.93 |
| Interest Rate | 2.000% |
| Interest Type | Actuarial |
| Prepayment Penalty | No |
| Next Rate Reset | 06/2017 |
| Property Address: | |
| | 205W EDGEVALE RD |
| | BROOKLYN MD 21225 |

† This is not your payoff amount. Please login to
MyAccount at ditech.com for a payoff figure.

## Past Payments Breakdown

**Since Last Statement/Month**

| | |
|---|---|
| Principal | $572.10 |
| Interest | $616.66 |
| Escrow (Tax & Insurance) | $264.08 |
| Total Fees and Charges | $0.00 |
| Funds in Suspense | ($1,452.84) |
| Total Paid | $0.00 |

**Year to Date**

| | |
|---|---|
| Principal | $1,845.47 |
| Interest | $2,018.00 |
| Escrow (Tax & Insurance) | $264.08 |
| Total Fees and Charges | $0.00 |
| Funds in Suspense | $25.93 |
| Total Paid Year to Date | $4,153.48 |

## Explanation of Amount Due

| | |
|---|---|
| Principal | $147.75 |
| Interest | $149.44 |
| Escrow (Tax & Insurance) | $303.73 |
| Regular Monthly Payment | $600.92 |
| Total New Fees and Charges | $0.00 |
| Past Due Amount | $9,678.23 |

## Transaction Activity Since Last Statement

| Date | Description | Charges | Payments |
|---|---|---|---|
| There were no transactions for this statement period. | | | |

## Important Messages (More Information on the Back)

**PARTIAL PAYMENTS:** Any partial payments that you make are not applied to your
mortgage, but instead are held in a separate suspense account. If you pay the
balance of a partial payment, the funds will then be applied to your mortgage.

^Advances represent money advanced by servicer to pay taxes, insurance and any
other amounts currently due that are not part of an escrow account.

Your account is now severely delinquent and your immediate action is required. Contact your
account representative, Matthew Z at 1-800-643-0202, extension 23181 to make immediate
payment arrangements.

## Total Amount Due: $10,279.15

**Delinquency Notice**

You are late on your mortgage payments. Failure to
bring your loan current may result in fees and foreclosure
- the loss of your home. As of October 12 you are 499
days delinquent on your mortgage loan. Your account
first became delinquent on 05/01/2015.

**Recent Account History**
- Payment Due 05/01/16: Unpaid amount of $556.94
- Payment Due 06/01/16: Unpaid amount of $556.94
- Payment Due 07/01/16: Unpaid amount of $556.94
- Payment Due 08/01/16: Unpaid amount of $600.92
- Payment Due 09/01/16: Unpaid amount of $600.92
- Payment Due 10/01/16: Unpaid amount of $600.92
- Total: **$10,279.15** due. You must pay this amount
to bring your loan current.

For a list of homeowners counselors or counseling
organizations in your area, go to
http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm or call
800-569-4287.

---

✂ - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ✂

## PLEASE DETACH AND RETURN THIS PORTION WITH YOUR PAYMENT

LISA ANDERSEN
205 W EDGEVALE RD
BROOKLYN MD 21225-2636

☐ Check box for address
changes on reverse side.

| Loan Number | Statement Date | Due Date | **Amount Due** |
|---|---|---|---|
| 0050486802 | 10/12/2016 | 11/01/2016 | **$10,279.15** |

**If payment is received after 11/16/2016,
a $14.86 late fee will be charged**

Make checks payable to Ditech Financial.

| | |
|---|---|
| Amount Due | $ |
| Additional Escrow | $ |
| Additional Late | $ |
| Additional Principal | $ |
| Total Amount Enclosed | $ |

Ditech
PO Box 94710
Palatine, IL 60094-4710

05048680 2    00060092    0001027915

 **ditech.**

PO Box 6172, Rapid City, SD 57709-6172

# BILLING STATEMENT

| Statement Date | Due Date | Amount Due |
|---|---|---|
| 10/17/2016 | 11/01/2016 | **$10,279.15** |

If payment is received after 11/16/2016, a $14.86 late fee will be charged

4-776-05612-0013205-002-1-001-000-000-000

 LISA ANDERSEN
205 W EDGEVALE RD
BROOKLYN MD 21225-2636

 AutoPay is Free Online at Ditech.com

 Mail your payment to
PO Box 94710
Palatine, IL 60094-4710

 Call 1-800-643-0202
Monday - Friday, 7a.m. - 8 p.m. CST
Saturday, 7a.m. - 1 p.m. CST

## Account Information

| | |
|---|---|
| Loan Number | 0050486802 |
| Principal Balance † | $92,141.26 |
| Escrow Balance | ($7,771.44) |
| Deferred Balance | $10,349.84 |
| Advance Balance ^ | $884.22 |
| Funds in Suspense Balance | $626.85 |
| Interest Rate | 2.000% |
| Interest Type | Actuarial |
| Prepayment Penalty | No |
| Next Rate Reset | 06/2017 |
| Property Address: | |
| | 205W EDGEVALE RD |
| | BROOKLYN MD 21225 |

† This is not your payoff amount. Please login to MyAccount at ditech.com for a payoff figure.

## Past Payments Breakdown

**Since Last Statement/Month**

| | |
|---|---|
| Principal | $0.00 |
| Interest | $0.00 |
| Escrow (Tax & Insurance) | $0.00 |
| Total Fees and Charges | $0.00 |
| Funds in Suspense | $600.92 |
| **Total Paid** | **$600.92** |

**Year to Date**

| | |
|---|---|
| Principal | $1,845.47 |
| Interest | $2,018.00 |
| Escrow (Tax & Insurance) | $264.08 |
| Total Fees and Charges | $0.00 |
| Funds in Suspense | $626.85 |
| **Total Paid Year to Date** | **$4,754.40** |

## Explanation of Amount Due

| | |
|---|---|
| Principal | $147.75 |
| Interest | $149.44 |
| Escrow (Tax & Insurance) | $303.73 |
| Regular Monthly Payment | $600.92 |
| Total New Fees and Charges | $0.00 |
| Past Due Amount | $9,678.23 |

## Transaction Activity Since Last Statement

| Date | Description | Charges | Payments |
|---|---|---|---|
| 10/14/16 | Payments | $0.00 | $600.92 |

**Total Amount Due: $10,279.15**

**\*\*Delinquency Notice\*\***

You are late on your mortgage payments. Failure to bring your loan current may result in fees and foreclosure - the loss of your home. As of October 17 you are 504 days delinquent on your mortgage loan. Your account first became delinquent on 06/01/2015.

**Recent Account History**
- Payment Due 05/01/16: Unpaid amount of $556.94
- Payment Due 06/01/16: Unpaid amount of $556.94
- Payment Due 07/01/16: Unpaid amount of $556.94
- Payment Due 08/01/16: Unpaid amount of $600.92
- Payment Due 09/01/16: Unpaid amount of $600.92
- Payment Due 10/01/16: Unpaid amount of $600.92
- Total: $10,279.15 due. You must pay this amount to bring your loan current.

For a list of homeownership counselors or counseling organizations in your area, go to http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm or call 800-569-4287.

## Important Messages (More Information on the Back)

PARTIAL PAYMENTS: Any partial payments that you make are not applied to your mortgage, but instead are held in a separate suspense account. If you pay the balance of a partial payment, the funds will then be applied to your mortgage.

^Advances represent money advanced by servicer to pay taxes, insurance and any other amounts currently due that are not part of an escrow account.

Your account is now severely delinquent and your immediate action is required. Contact your account representative, Matthew Z at 1-800-643-0202, extension 23181 to make immediate payment arrangements.

✂ - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ✂

## PLEASE DETACH AND RETURN THIS PORTION WITH YOUR PAYMENT

LISA ANDERSEN
205 W EDGEVALE RD
BROOKLYN MD 21225-2636

| Loan Number | Statement Date | Due Date | Amount Due |
|---|---|---|---|
| 0050486802 | 10/17/2016 | 11/01/2016 | **$10,279.15** |

If payment is received after 11/16/2016, a $14.86 late fee will be charged

☐ Check box for address changes on reverse side.

Make checks payable to Ditech Financial.

| | |
|---|---|
| Amount Due | $ |
| Additional Escrow | $ |
| Additional Late | $ |
| Additional Principal | $ |
| Total Amount Enclosed | $ |

Ditech
PO Box 94710
Palatine, IL 60094-4710

05048680 2    00060092    0001027915

 **ditech**®

PO Box 6172, Rapid City, SD 57709-6172

4-776-05617-0017528-002-1-001-000-000-000

 LISA ANDERSEN
205 W EDGEVALE RD
BROOKLYN MD 21225-2636

# BILLING STATEMENT

| Statement Date | Due Date | Amount Due |
|---|---|---|
| 10/18/2016 | 11/01/2016 | **$9,717.88** |

**If payment is received after 11/16/2016, a $14.86 late fee will be charged**

 AutoPay is Free Online at Ditech.com

 Mail your payment to
PO Box 94710
Palatine, IL 60094-4710

 Call 1-800-643-0202
Monday - Friday, 7a.m. - 8 p.m. CST
Saturday, 7a.m. - 1 p.m. CST

## Account Information

| | |
|---|---|
| Loan Number | 0050486802 |
| Principal Balance † | $91,997.64 |
| Escrow Balance | ($7,507.36) |
| Deferred Balance | $10,349.84 |
| Advance Balance ^ | $884.22 |
| Funds in Suspense Balance | $65.58 |
| Interest Rate | 2.000% |
| Interest Type | Actuarial |
| Prepayment Penalty | No |
| Next Rate Reset | 06/2017 |
| Property Address: | |
| | 205W EDGEVALE RD |
| | BROOKLYN MD 21225 |

† This is not your payoff amount. Please login to
MyAccount at ditech.com for a payoff figure.

## Past Payments Breakdown

**Since Last Statement/Month**

| | |
|---|---|
| Principal | $143.62 |
| Interest | $153.57 |
| Escrow (Tax & Insurance) | $264.08 |
| Total Fees and Charges | $0.00 |
| Funds in Suspense | ($561.27) |
| Total Paid | $0.00 |

**Year to Date**

| | |
|---|---|
| Principal | $1,989.09 |
| Interest | $2,171.57 |
| Escrow (Tax & Insurance) | $528.16 |
| Total Fees and Charges | $0.00 |
| Funds in Suspense | $65.58 |
| Total Paid Year to Date | $4,754.40 |

## Explanation of Amount Due

| | |
|---|---|
| Principal | $147.75 |
| Interest | $149.44 |
| Escrow (Tax & Insurance) | $303.73 |
| Regular Monthly Payment | $600.92 |
| Total New Fees and Charges | $0.00 |
| Past Due Amount | $9,116.96 |

## Transaction Activity Since Last Statement

| Date | Description | Charges | Payments |
|---|---|---|---|
| There were no transactions for this statement period. | | | |

## Total Amount Due: $9,717.88

**\*\*Delinquency Notice\*\***

You are late on your mortgage payments. Failure to
bring your loan current may result in fees and foreclosure
- the loss of your home. As of October 18 you are 475
days delinquent on your mortgage loan. Your account
first became delinquent on 07/01/2015.

Recent Account History
-Payment Due 05/01/16: Unpaid amount of $559.94
-Payment Due 06/01/16: Unpaid amount of $559.94
-Payment Due 07/01/16: Unpaid amount of $559.94
-Payment Due 08/01/16: Unpaid amount of $600.92
-Payment Due 09/01/16: Unpaid amount of $600.92
-Payment Due 10/01/16: Unpaid amount of $600.92
-Total: $9,717.88 due. You must pay this amount to
bring your loan current.

For a list of homeownership counselors or counseling
organizations in your area, go to
http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm or call
800-569-4287.

## Important Messages (More Information on the Back)

PARTIAL PAYMENTS: Any partial payments that you make are not applied to your
mortgage, but instead are held in a separate suspense account. If you pay the
balance of a partial payment, the funds will then be applied to your mortgage.

^Advances represent money advanced by servicer to pay taxes, insurance and any
other amounts currently due that are not part of an escrow account.

Your account is now severely delinquent and your immediate action is required. Contact your
account representative, Mathew Z at 1-800-643-0202, extension 23181 to make immediate
payment arrangements.

---

## PLEASE DETACH AND RETURN THIS PORTION WITH YOUR PAYMENT

LISA ANDERSEN
205 W EDGEVALE RD
BROOKLYN MD 21225-2636

☐ Check box for address
changes on reverse side.

Make checks payable to Ditech Financial.

| Loan Number | Statement Date | Due Date | Amount Due |
|---|---|---|---|
| 0050486802 | 10/18/2016 | 11/01/2016 | **$9,717.88** |

**If payment is received after 11/16/2016, a $14.86 late fee will be charged**

| | |
|---|---|
| Amount Due | $ |
| Additional Escrow | $ |
| Additional Late | $ |
| Additional Principal | $ |
| Total Amount Enclosed | $ |

Ditech
PO Box 94710
Palatine, IL 60094-4710

05048680 2   00060092   0000971788

 **ditech**®

PO Box 6172, Rapid City, SD 57709-6172

2-776-06028-0020123-003-1-001-000-000-000

 LISA ANDERSEN
205 W EDGEVALE RD
BROOKLYN MD 21225-2636

# BILLING STATEMENT

| Statement Date | Due Date | **Amount Due** |
|---|---|---|
| 11/16/2016 | 12/01/2016 | **$10,318.80** |

If payment is received after 12/16/2016,
a $14.86 late fee will be charged

 AutoPay is Free Online at Ditech.com

 Mail your payment to
PO Box 94710
Palatine, IL 60094-4710

 Call 1-800-643-0202
Monday - Friday, 7a.m. - 8 p.m. CST
Saturday, 7a.m. - 1 p.m. CST

## Account Information

| | |
|---|---|
| Loan Number | 0050486802 |
| Principal Balance † | $91,997.64 |
| Escrow Balance | ($7,507.36) |
| Deferred Balance | $10,349.84 |
| Advance Balance ^ | $884.22 |
| Funds in Suspense Balance | $65.58 |
| Interest Rate | 2.000% |
| Interest Type | Actuarial |
| Prepayment Penalty | No |
| Next Rate Reset | 06/2017 |
| Property Address: | |
| | 205W EDGEVALE RD |
| | BROOKLYN MD 21225 |

† This is not your payoff amount. Please login to
MyAccount at ditech.com for a payoff figure.

## Past Payments Breakdown

**Since Last Statement/Month**

| | |
|---|---|
| Principal | $0.00 |
| Interest | $0.00 |
| Escrow (Tax & Insurance) | $0.00 |
| Total Fees and Charges | $0.00 |
| Funds in Suspense | $0.00 |
| Total Paid | $0.00 |

**Year to Date**

| | |
|---|---|
| Principal | $1,989.09 |
| Interest | $2,171.57 |
| Escrow (Tax & Insurance) | $528.16 |
| Total Fees and Charges | $0.00 |
| Funds in Suspense | $65.58 |
| Total Paid Year to Date | $4,754.40 |

## Explanation of Amount Due

| | |
|---|---|
| Principal | $147.99 |
| Interest | $149.20 |
| Escrow (Tax & Insurance) | $303.73 |
| Regular Monthly Payment | $600.92 |
| Total New Fees and Charges | $0.00 |
| Past Due Amount | $9,717.88 |

## Transaction Activity Since Last Statement

| Date | Description | Charges | Payments |
|---|---|---|---|
| There were no transactions for this statement period. | | | |

## Total Amount Due: $10,318.80

**\*\*Delinquency Notice\*\***

You are late on your mortgage payments. Failure to
bring your loan current may result in fees and foreclosure
- the loss of your home. As of November 16 you are 504
days delinquent on your mortgage loan. Your account
first became delinquent on 07/01/2015.

**Recent Account History**
- Payment Due 06/01/16:   Unpaid amount of $556.94
- Payment Due 07/01/16:   Unpaid amount of $556.94
- Payment Due 08/01/16:   Unpaid amount of $600.92
- Payment Due 09/01/16:   Unpaid amount of $600.92
- Payment Due 10/01/16:   Unpaid amount of $600.92
- Payment Due 11/01/15:   Unpaid amount of $600.92

-Total: $10,318.80 due. You must pay this amount
to bring your loan current.

For a list of homeowners counselors or counseling
organizations in your area, go to
http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm or call
800-569-4287.

## Important Messages (More information on the Back)

PARTIAL PAYMENTS: Any partial payments that you make are not applied to your
mortgage, but instead are held in a separate suspense account. If you pay the
balance of a partial payment, the funds will then be applied to your mortgage.

^Advances represent money advanced by servicer to pay taxes, insurance and any
other amounts currently due that are not part of an escrow account.

Your account is now severely delinquent and your immediate action is required. Contact your
account representative, Matthew Z at 1-800-643-0202, extension 23181 to make immediate
payment arrangements.

✂ - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ✂

### PLEASE DETACH AND RETURN THIS PORTION WITH YOUR PAYMENT

LISA ANDERSEN
205 W EDGEVALE RD
BROOKLYN MD 21225-2636

☐ Check box for address
changes on reverse side.

| Loan Number | Statement Date | Due Date | **Amount Due** |
|---|---|---|---|
| 0050486802 | 11/16/2016 | 12/01/2016 | **$10,318.80** |

If payment is received after 12/16/2016,
a $14.86 late fee will be charged

Make checks payable to Ditech Financial.

| | |
|---|---|
| Amount Due | $ |
| Additional Escrow | $ |
| Additional Late | $ |
| Additional Principal | $ |
| Total Amount Enclosed | $ |

Ditech
PO Box 94710
Palatine, IL 60094-4710

05048680 2   00060092   0001031880

# EXHIBIT D



Ditech Financial LLC
Attention: Loss Mitigation, T214
7360 South Kyrene Road
Tempe, AZ 85823

October 21, 2016

LISA ANDERSEN
205 W EDGEVALE RD
BROOKLYN, MD 21225

Re: Ditech Financial LLC, ("Ditech")
    Account Number: 0050486802
    Property Address: 205 W EDGEVALE RD
                      BROOKLYN, MD 21225

Dear LISA ANDERSEN:

**Congratulations!** You are approved for a permanent modification. This is the first step towards qualifying for a more affordable mortgage payment. Please read this letter in its entirety so that you understand all of the steps you need to take to modify your mortgage payments.

**What you need to do:**
To accept this offer and take advantage of this opportunity, you must sign and return the enclosed Agreement by 11/20/2016. After the signed Agreement has been received, your mortgage will then be permanently modified. If you do not provide the required signed Agreement by the above-referenced date, this offer will end and your loan will not be modified.

If you have any questions, please call us toll-free at 1-800-643-0202, Monday - Friday 7 a.m. to 8 p.m., Saturday 7 a.m. to 1 p.m. CST.

Ditech Financial LLC
Attention: Loss Mitigation, T111
2100 East Elliot Road, Building 94
Tempe, AZ 85284
Fax: 1-877-612-2422

Ditech has designated the following address where mortgage loan customers must send any Qualified Written Request, Notice of Error or Request for Information: PO Box 6176, Rapid City, SD 57709-6176.

---

## Account Modification
## TRANSPARENCY NOTICE

This Account Modification Summary is intended to be a clear and simple summary of the final account modification that we are pleased to offer you. We believe the account modification will help put you in a better position to make the account payments. When you sign and return the enclosed account modification agreement, you are agreeing to a new and permanent account modification. Please thoroughly review all of the enclosed documents to ensure that you understand the details of your account modification agreement.

**Summary of Your Modified Account:**

Your new balance is $113,247.20. To calculate this new account balance, we added past due interest in the amount of $2,573.72 and eligible servicing expenses of $884.22 and taxes and insurance of $7,507.36 totaling $10,965.30 to your principal balance. Unpaid late fees are not included in this amount and will be waived when your account modification is finalized. If your account has mortgage insurance, the mortgage insurance premium may increase as a result of the higher mortgage loan balance.

The current interest rate of 2.000% is changing to 3.875% for the life of your modified account.

Your final payment date, which is your new maturity date, is November 1, 2056.

**Your New Mortgage Payments:**

Your new total modified monthly mortgage payments of $712.19 are made up of principal and interest of $464.54 and an initial escrow amount of $247.65. Escrow payments are collected for payment of items such as property taxes and insurance and may change. We will notify you of any adjustments to the total monthly payment.

Your total monthly payments will be due on the 1st of the month starting the 1st of December, 2016.

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|-------|---------------|---------------------------|-----------------------------------------------|------------------------------------------|------------------------|-------------------|----------------------------|
| 1 - 40 | 3.875% | 11/01/2016 | $464.54 | $247.65, may adjust periodically | $712.19, may adjust periodically | 12/01/2016 | 480 |

* The escrow payments may be adjusted periodically in accordance with applicable law and therefore the total monthly payment may change accordingly.

If you have questions regarding the modification agreement or the steps you must take to complete this process, please call your assigned account representative MATTHEW Z at 1-800-643-0202, extension 23181 Monday - Friday 7 a.m. to 8 p.m., Saturday 7 a.m. to 1 p.m. CST.



1-31-16

09/18/2015
LTR-431

0050486802
Mod Transparency Notice

2016102116.2.0.3814-N20150825Y



Investor Account # 1703878722

When Recorded, Return to:
Ditech Financial LLC
2100 East Elliot Road, Building 94 T214
Tempe, AZ 85284

This document was prepared by Ditech Financial LLC

[Space above This Line for Recording Data] _____

Customer(s)[1]: LISA A. ANDERSEN, 205 W. Edgevale Rd, Brooklyn, MD 21225
Lender/Servicer ("Lender"): Ditech Financial LLC, 2100 E. Elliot Rd, Bldg. 94, Tempe, AZ 85284
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): 04/12/2007 Account Number:
0050486802, Recorded 05/09/2007, Book 19067, Page 181, Original Mortgage Amt $111,000.00, New Modified Amt
$113,247.20, Unpaid Principal Balance $91,997.64, New Money $21,249.56
MIN: 100162500031435945
Property Address ("Property"): 205 W EDGEVALE RD, BROOKLYN, MD 21225

## MODIFICATION AGREEMENT

This Modification Agreement ("Agreement"), made this ____day of _____ 2016, between the Lender and Customer,
amends and supplements 1) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), and Timely Payment
Rewards Rider, if any, dated 04/12/2007 and recorded in Book or Liber 19067, at page(s) 181, and/or Document
#n/a of the _____ clerk _____        Records of  anne arundel county _____
                    (Name of Records)                    (County and State, or other Jurisdiction)

and (2) the Note, bearing the same date as, and secured by, the Security Instrument, which covers the real and personal
property described in the Security Instrument and defined therein as the "Property", located at
                    205 W EDGEVALE RD, BROOKLYN, MD 21225 _____
_____                    (Property Address)

the real property described in the above-referenced Security Instrument.

   In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows
(notwithstanding anything to the contrary contained in the Note or Security Instrument):

1.   As of 11/01/2016, the amount payable under the Note and the Security Instrument (the "New Principal Balance")
     is U.S. $113,247.20 consisting of the unpaid amount(s) loaned to Customer by Lender plus any interest and
     other amounts capitalized.

2.   Customer promises to pay the Unpaid Principal Balance, plus interest, to the order of Lender. Interest will be
     charged on the Unpaid Principal Balance at the yearly rate of 3.875%, from 11/01/2016. Customer promises to
     make monthly payments of principal and interest of U.S. $464.54, beginning on the 12/01/2016, and continuing
     thereafter on the same day of each succeeding month until principal and interest are paid in full. The yearly rate
     of 3.875% will remain in effect until principal and interest are paid in full. The new monthly payment amount
     does not include any amounts owed for escrow. Customer may refer to the monthly billing statement for the
     escrow amount owed. If on 11/01/2056 (the "Maturity Date"), Customer still owes amounts under the Note and



the Security Instrument, as amended by this Agreement, Customer will pay these amounts in full on the Maturity Date. Customer's payment schedule for the modified account is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1 - 40 | 3.875% | 11/01/2016 | $464.54 | $247.65, may adjust periodically | $712.19, may adjust periodically | 12/01/2016 | 480 |

3.    If all or any part of the Property or any interest in the Property is sold or transferred (or if Customer is not a natural person and a beneficial interest in Customer is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

If Lender exercises this option, Lender shall give Customer notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Customer must pay all sums secured by the Security Instrument. If Customer fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Customer.

Customer understands and agrees that: .

(a)    All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

(b)    All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Customer's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

(c)    Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

(d)    All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Customer and shall be secured by the Security Instrument, unless stipulated otherwise by Lender.

(e)    Customer acknowledges that Lender is required to report any debt forgiveness to the Internal Revenue Service which may result in consequences regarding Customer's federal, state or local tax liability. In addition, Customer understands that if Customer receives public assistance, the forgiveness of debt may affect Customer's eligibility for these benefits. Customer acknowledges that Lender cannot provide any advice or guidance regarding possible tax consequences or effect on any public assistance benefits. Customer further acknowledges that Lender has advised that Customer may wish



to consult with a tax professional about any possible tax consequences and/or their public assistance office regarding other consequences that may result from the forgiveness of debt.

(f)    Customer agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Customer.

(g)    Customer authorizes Lender, and Lender's successors and assigns, to share certain Customer public and non-public personal information including, but not limited to (i) name, address, telephone number, (ii) Social Security Number, (iii) credit score, (iv) income, and (v) payment history and information about Customer's account balances and activity, with an authorized third Agency or similar entity that is assisting Customer in connection with obtaining a foreclosure prevention alternative, including the trial period plan to modify Customer's account ("Authorized Third Party").

Customer understands and consents to Lender or Authorized Third Party, as well as Fannie Mae (the owner of Customer's account), disclosing such personal information and the terms of any relief or foreclosure prevention alternative, including the terms of the trial period plan to modify Customer's account, to any insurer, guarantor, or servicer that insures, guarantees, or services Customer's account or any other mortgage account secured by the Property on which Customer is obligated, or to any companies that perform support services to them in connection with the account or any other mortgage account secured by the Property on which Customer is obligated.

Customer consents to being contacted by Fannie Mae, Lender or Authorized Third Party concerning mortgage assistance relating to Customer's account.

4.    By this paragraph, lender is notifying customer that any prior waiver by lender of customer's obligation to pay to lender funds for any or all escrow items is hereby revoked, and customer has been advised of amount needed to fund the escrow items.

Customer will pay to Lender on the day payments are due under the Account Documents as amended by this Agreement, until the Account is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Account Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Account Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." Customer shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. Customer shall pay Lender the Funds for Escrow Items unless Lender waives Customer's obligation to pay the Funds for any or all Escrow Items. Lender may waive Customer's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Customer shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Customer's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Account Documents, as the phrase "covenant and agreement" is used in the Account Documents. If Customer is obligated to pay Escrow Items directly, pursuant to a waiver, and Customer fails to pay the amount due for an Escrow Item, Lender may exercise its rights under the Account Documents and this Agreement and pay such amount and Customer shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in

accordance with the Account Documents, and, upon such revocation, Customer shall pay to Lender all Funds, and in such amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Customer for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Customer interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Customer any interest or earnings on the Funds. Lender and Customer can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide Customer, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Customer for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Customer as required by RESPA, and Customer shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Customer as required by RESPA, and Customer shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Account Documents, Lender shall promptly refund to Customer any Funds held by Lender.

5.     Customer also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Customer's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Customer is obligated to make under the Security Instrument; however, the following terms and provisions are forever canceled, null and void, as of the date specified in paragraph No. 1 above:

    (a)     all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note, including, where applicable, the Timely Payment Rewards rate reduction, as described in paragraph 1 of the Timely Payment Rewards Addendum to Note and paragraph A.1. of the Timely Payment Rewards Rider. By executing this Agreement, Customer waives any Timely Payment Rewards rate reduction to which Customer may have otherwise been entitled; and

    (b)     all terms and provisions of any adjustable rate rider, or Timely Payment Rewards Rider, where applicable, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

6.     Customer understands and agrees that:

0050486802
LOAN MODIFICATION AGREEMENT - Single Family - Fannie Mae Uniform Instrument      2018102116.2.0.3614-N20150826Y



(a) All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

(b) All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Customer's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

(c) Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

(d) All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Customer and shall be secured by the Security Instrument, unless stipulated otherwise by Lender.

(e) Customer agrees to execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Plan if an error is detected after execution of this Agreement. Customer understands that a corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error. If Customer elects not to sign any such corrected Agreement, the terms of the original Account Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and Customer will not be eligible for a modification.



In Witness Whereof, the Lender and I have executed this Agreement.

Ditech Financial LLC FKA Green Tree Servicing LLC
Lender

LISA A. ANDERSEN

By: _____

Date _____

Date

This communication is from a debt collector. It is an attempt to collect a debt, and any information obtained will be used for that purpose.

[Space Below This Line For Acknowledgments] _____



STATE OF: MARYLAND,

County ss:

I Hereby Certify, That on this _____ day of _____, before me, the subscriber, a Notary Public of the State of Maryland, in and for the county of _____, personally appeared

LISA A. ANDERSEN

Known to me or satisfactorily proven to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledge that he/she/they executed the same for the purposes therein contained.

AS WITNESS:  my hand and notarial seal.

_____
Notary Public

My Commission Expires:

CERTIFICATE OF PREPARATION

This is to certify that this instrument was prepared by Green Tree Servicing LLC, one of the parties named in this instrument.

_____     Date_____
Signature

_____
(Print name and Title)

## Exhibit A

BEGINNING FOR THE SAME ON THE SOUTHWEST SIDE OF EDGEVALE ROAD AT THE DISTANCE OF ONE HUNDRED FEET NORTHWESTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE SOUTHWEST SIDE OF EDGEVALE ROAD WITH THE NORTHWEST SIDE OF LEVIN ROAD, AND RUNNING THENCE NORTHWESTERLY BINDING ON THE SOUTHWEST SIDE OF EDGEVALE ROAD TWENTY-SIX AND FOUR TENTHS FEET TO A POINT IN LINE WITH THE CENTER LINE OF A PARTITION WALL BETWEEN THE HOUSE ON THE LOT NOW BEING DESCRIBED AND THAT ADJOINING ON THE NORTHWEST THENCE SOUTHWESTERLY TO AND THROUGH THE CENTER OF SAID WALL TO THE END THEREOF AND CONTINUING THE SAME COURSE IN ALL ONE HUNDRED TWENTY FEET TO AN ALLEY FIFTEEN FEET WIDE THENCE SOUTHEASTERLY BINDING THEREON WITH THE USE THEREOF IN COMMON WITH OTHERS TWENTY-SIX AND FOUR-TENTHS FEET TO INTERSECT A LINE DRAWN FROM THE PLACE OF BEGINNING SOUTHWESTERLY PARALLEL WITH LEVIN ROAD AND THENCE NORTHEASTERLY REVERSING SAID LINE AND BOUNDING THEREON ONE HUNDRED TWENTY FEET TO THE PLACE OF BEGINNING. THE IMPROVEMENTS KNOWN AS 205 W. EDGEVALE ROAD, BROOKLYN PARK.

BEING THE SAME PROPERTY CONVEYED UNTO LISA A. ANDERSEN BY DEED FROM JACK E. FOX, JR. AND SHELBY L. FOX, TENANTS BY THE ENTIRETY DATED 4/29/2004 AND RECORDED ON 6/3/2004 IN BOOK 14905, PAGE 27, ANNE ARUNDEL COUNTY, STATE OF MARYLAND.

TAX ID: 504712679500

EXHIBIT E

Green Tree Servicing LLC
PO Box 6172
Rapid City, SD 57709
1-800-643-0202

relationships that work
# green tree®

+ 0512690 000001832 096024 0011100 IEDL
LISA ANDERSEN
205 W EDGEVALE RD
BROOKLYN MD 21225-2636

September 18, 2014

Re:  Initial Escrow Account Disclosure Statement
     Account No. 824309074

Dear Lisa Andersen:

Your monthly payment for the coming year will consist of the following:

| | |
|---|---|
| Principal and Interest | $297.19 |
| Escrow | $221.37 |
| Total Monthly Payment | $518.56 |

This is an estimate of activity in your escrow account during the coming year based on anticipated payments to be made from your account.



| | PAYMENTS TO ESCROW | | PAYMENTS FROM ESCROW | | | | ESCROW BALANCE | |
|---|---|---|---|---|---|---|---|---|
| Month | Projected | Actual | Projected | Description | Actual | Description | Projected | Required |
| | | | | Begin Bal | | | 190.27- | 647.40 |
| | | .00 | | | .00 | | 616.30- | 221.37 |
| Sep 14 | 221.37 | .00 | 647.40 | Tax | .00 | | 394.93- | 442.74 |
| Oct 14 | 221.37 | .00 | .00 | | .00 | | 173.56- | 664.11 |
| Nov 14 | 221.37 | .00 | .00 | | .00 | | 600.35- | 237.32 |
| Dec 14 | 221.37 | .00 | 648.16 | Tax | .00 | | 378.98- | 458.69 |
| Jan 15 | 221.37 | .00 | .00 | | .00 | | 157.61- | 680.06 |
| Feb 15 | 221.37 | .00 | .00 | | .00 | | 63.76 | 901.43 |
| Mar 15 | 221.37 | .00 | .00 | | .00 | | 285.13 | 1,122.80 |
| Apr 15 | 221.37 | .00 | .00 | | .00 | | 506.50 | 1,344.17 |
| May 15 | 221.37 | .00 | .00 | | .00 | | 727.87 | 1,565.54 |
| Jun 15 | 221.37 | .00 | 1,360.82 | Hazard | .00 | | 411.58- | 426.09 |
| Jul 15 | 221.37 | .00 | .00 | | .00 | | 190.21- | 647.46 |
| Aug 15 | 221.37 | .00 | | | | | | |

PLEASE KEEP THIS STATEMENT FOR COMPARISON WITH THE ACTUAL ACTIVITY IN YOUR ACCOUNT AT THE END OF THE ESCROW ACCOUNTING COMPUTATIONAL YEAR.

Cushion: $442.74

Under federal law, your lowest monthly balance should not fall below $442.74 or 1/6 of the anticipated payments from your escrow account, unless your mortgage documents or state law specifies a lower amount. According to your mortgage documents or state law, your lowest monthly balance should not fall below $442.74.

This is an estimate of activity in your escrow account during the coming year based upon anticipated payments to be made from your escrow account.

Projected Escrow Disbursements:
Hazard      $1,360.82
Tax         $1,295.56

Total Projected Escrow Disbursements: $2,656.38  Escrow Payment Calculation: $2,656.38 / 12 = $221.37.

After performing your initial escrow analysis, your escrow account has a shortage of $221.37. You may either remit the escrow shortage or it will be spread over the next 60 months. To remit the escrow shortage, please send shortage payment to:

**Green Tree**
**Attn: Escrow Dept L800-LM**
**345 St. Peter Street**
**St. Paul, MN 55102**

Please contact us at 1-800-643-0202 if you have any questions.

Respectfully,

Escrow Administration
Green Tree

**If you filed bankruptcy, this is not an attempt to collect a debt but is instead a legally required notice regarding your escrowed taxes and insurance.**

Green Tree Servicing LLC
Attn: Escrow Dept L1000-LM
345 St. Peter Street
St. Paul, MN 55102
Phone: 1-800-643-0202
Fax: 1-480-383-0632
www.greentreeservicing.com

relationships that work

# green tree®

+ 0558765 000002170 096024 0926708 IEDL1
**LISA ANDERSEN**
205 W EDGEVALE RD
BROOKLYN MD 21225-2636

May 14, 2015

RE:   **Initial Escrow Account Disclosure Statement**
      Account No. 824309074

Dear LISA ANDERSEN:

Your monthly payment for the coming year will consist of the following:

| | |
|---|---|
| Principal and Interest | $297.19 |
| Escrow | $259.75 |
| Total Monthly Payment | $556.94 |

This is an estimate of activity in your escrow account during the coming year based on anticipated payments to be made from your account.

| | Payments to Escrow | | Payments From Escrow | | | | | Escrow Balance | |
|---|---|---|---|---|---|---|---|---|---|
| Month | Projected | Actual | Projected Taxes | Projected Insurance | Projected PMI | Actual | Description | Projected | Required |
| | | | | | | | Begin Bal | 300.10 | 902.72 |
| | | | | | | | | 559.85 | 1,162.47 |
| May 15 | 259.75 | | .00 | .00 | .00 | .00 | | 819.60 | 1,422.22 |
| Jun 15 | 259.75 | | .00 | 1,360.82 | .00 | .00 | | 281.47- | 321.15 |
| Jul 15 | 259.75 | | .00 | .00 | .00 | .00 | | 21.72- | 580.90 |
| Aug 15 | 259.75 | | 655.12 | .00 | .00 | .00 | | 417.09- | 185.53 |
| Sep 15 | 259.75 | | .00 | .00 | .00 | .00 | | 157.34- | 445.28 |
| Oct 15 | 259.75 | | .00 | .00 | .00 | .00 | | 102.41 | 705.03 |
| Nov 15 | 259.75 | | 655.76 | .00 | .00 | .00 | | 293.60- | 309.02 |
| Dec 15 | 259.75 | | .00 | .00 | .00 | .00 | | 33.85- | 568.77 |
| Jan 16 | 259.75 | | .00 | .00 | .00 | .00 | | 225.90 | 828.52 |
| Feb 16 | 259.75 | | .00 | .00 | .00 | .00 | | 485.65 | 1,088.27 |
| Mar 16 | 259.75 | | .00 | .00 | .00 | .00 | | 745.40 | 1,348.02 |
| Apr 16 | 259.75 | | .00 | .00 | .00 | .00 | | | |

PLEASE KEEP THIS STATEMENT FOR COMPARISON WITH THE ACTUAL ACTIVITY IN YOUR ACCOUNT AT THE END OF THE ESCROW ACCOUNTING COMPUTATIONAL YEAR.

Cushion: $445.28

Under federal law, your lowest monthly balance should not fall below $445.28 or 1/6 of the anticipated payments from your escrow account, unless your mortgage documents or state law specifies a lower amount. According to your mortgage documents or state law, your lowest monthly balance should not fall below $445.28

This is an estimate of activity in your escrow account during the coming year based upon anticipated payments to be made from your escrow account.

| Projected Escrow Disbursements: | |
|---|---|
| Hazard | $1,360.82 |
| Tax | $1,310.88 |

Total Projected Escrow Disbursements: $2,671.70  Escrow Payment Calculation: $2,671.70 / 12 = $259.75.

After performing your initial escrow analysis, your escrow account has a shortage of $259.75. You may either remit the escrow shortage or it will be spread over the next 60 months. To remit the escrow shortage, please send shortage payment to:

**Green Tree**
**Attn: Escrow Dept L1000-LM**
**345 St. Peter Street**
**St. Paul, MN 55102**

Please contact us at 1-800-643-0202 if you have any questions.

Respectfully,

Green Tree
Escrow Administration
1-800-643-0202
Monday - Friday 7 a.m. to 8 p.m. CST and Saturday 7 a.m. to 1 p.m. CST

This communication is from a debt collector. It is an attempt to collect a debt, and any information obtained will be used for that purpose.



**ditech.**
a Walter company

PO Box 6172
Rapid City, SD 57709-6172
1(877) 624-8026

3-776-05470-0000925-001-100-000-000-000

LISA ANDERSEN
205 W EDGEVALE RD
BROOKLYN MD 21225-2636

**Annual Escrow Account Disclosure Statement**

| | |
|---|---|
| Statement Date | 10/05/2016 |
| Account Number | 0050466802 |

| | |
|---|---|
| Customer Service: | 1-877-624-8026 |
| Hours: | Mon. – Fri. 7:00AM to 8:00PM CST |
| | Sat. 7:00AM to 4:00PM CST |
| Website: | www.ditech.com |
| Payment Due Date: | 02/01/2016 |
| Principal and Interest: | $297.19 |
| Escrow: | $.00 |
| Total Current Payment | $297.19 |

| | |
|---|---|
| New Payment Effective: | 02/01/2017 |
| Principal and Interest: | $297.19 |
| Escrow: | $236.86 |
| Escrow Shortage: | $61.91 |
| Total New Payment | $594.96 |

Ditech Financial LLC reviews your escrow account each year to determine if the current monthly payment amounts are sufficient to cover your projected property taxes and/or insurance premiums. Increases or decreases in your annual tax and/or insurance amounts may cause your monthly mortgage payment to change. Your monthly mortgage payment may also change if your loan totals include an adjustable rate feature or buy down assistance.

The section below sets forth your anticipated escrow activity for the next 12 months. Projected figures are based on information provided by sources which may include: The last tax or insurance payments disbursed, and figures provided to Ditech Financial LLC by your prior servicer. See the reverse side for recent escrow history.

**ESCROW DISBURSEMENT**

Current Anticipated Disbursements
This year, we anticipate that payments
from your account will equal 2,830.31

| | |
|---|---|
| HAZARD INS | $1,504.95 |
| COUNTY TAX | $1,325.36 |
| Total Disbursements | $2,830.31 |

**PROJECTED ESCROW ACTIVITY FOR THE NEXT 12 MONTH ESCROW CYCLE**

Your ending escrow balance from the last month of the account history is -$2,962.24. Your starting balance according to this analysis should be $657.81. This meant you have a deficiency of -$2,962.25. This deficiency may be collected from you over a period of 12 months or extra unless the deficiency is less than 1 month's escrow account payment, in which case you have the additional option of requesting payment within 30 days. We will ask you to pay it over 12 months or after considering the deficiency of -$2,962.26, you still have a shortage of $762.47. This shortage may be collected from you over a period of 12 months or more unless the shortage is less than 1 month's escrow account payment, in which case you have the additional option of requesting payment within 30 days. We will ask you to pay it over 60 months.

| Month | Payments To Escrow | Payments From Escrow | Description | Required Balance | Projected Balance |
|---|---|---|---|---|---|
| | | | STARTING BALANCE | $762.47 | -$2,962.25 |
| | | | | $998.33 | -$2,726.39 |
| FEB 17 | $235.86 | | | $1,224.19 | -$2,490.53 |
| MAR 17 | $235.86 | | | $1,460.05 | -$2,254.67 |
| APR 17 | $235.86 | | | $1,695.91 | -$2,018.81 |
| MAY 17 | $235.86 | | | $1,931.77 | -$1,782.95 |
| JUN 17 | $235.86 | | | $662.88 | -$3,052.04 |
| JUL 17 | $235.86 | -$1,504.95 | HAZARD INS | $898.54 | -$2,816.18 |
| AUG 17 | $235.86 | -$662.68 | CNTY TX PARC | $471.72 | -$3,243.00 |
| SEP 17 | $235.86 | | | $707.59 | -$3,007.14 |
| OCT 17 | $235.86 | | | $943.44 | -$2,771.28 |
| NOV 17 | $235.86 | -$662.68 | CNTY TX PARC | $516.62 | -$3,108.10 |
| DEC 17 | $235.86 | | | $752.48 | -$2,962.24 |
| JAN 18 | $235.86 | | | | |
| TOTAL | $2,830.32 | -$2,830.31 | | | |

**Escrow Payment Calculation**
$2,830.31 / 12 months = $235.86

**Calculation of Escrow Adjustment**

| | |
|---|---|
| Beginning Required Balance | $762.47 |
| Beginning Projected Balance | -$2,962.25 |
| Escrow Shortage | $3,714.72 |
| Monthly Escrow Adjustment | $61.91 |
| (Escrow Shortage divided by 60) | |

**CUSHION SELECTED BY SERVICER:** $471.72

An escrow analysis has been performed on your account, and your escrow account has a shortage of -$762.47 and a deficiency of -$2,962.25. The shortage and deficiency has been spread over the next 60 monthly payments. If your shortage of -$762.47 and deficiency of -$2,962.25 is paid prior to the effective date of 02/01/2017, your payment will be adjusted to $533.05 if no further activity occurs on your account. Please note that the new payment amount may not be reflected on your next billing statement if it is already in process.

Notice: Ditech Financial LLC is a licensed mortgage servicer and debt collector.

Notwithstanding anything herein to the contrary, if you have filed a bankruptcy petition and there is either an "automatic stay" in effect in your bankruptcy case or you have received in that case a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, however, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.

When you send in a check to make your payment, Ditech Financial LLC may clear the check electronically. Receipt of the check at the address listed on your payment coupon will authorize us to process your payment as an electronic debit to the checking account on which the check was written.

Your account history may answer your questions. If not, please call our toll free number for further assistance at 1-877-624-8026.

**IMPORTANT MESSAGES**

Our website has new content. Visit www.ditech.com to learn about new Topics of Interest and view our expanded FAQ section. You can also click on the Borrower Services tab to register for GT Portal where you can make a payment, view your payment history, activate online statements and much more.

---

**INTERNET REPRINT**
Detach and return this portion with remittance
Please make checks payable to Ditech
**ACCOUNT NUMBER 0050466802**

**ditech.**
a Walter company

Receipt of a personal check is authorization to collect payment electronically

SHORTAGE AND/OR DEFICIENCY DUE $3,714.72

TOTAL ENCLOSED $ [ ][ ][ ][ ][ ][ ]
Enter total amount of payment enclosed

EQUAL HOUSING LENDER

Please use this coupon for escrow payments only.
Use of this coupon for funds not intended for
escrow may result in delayed payment posting.

LISA ANDERSEN
205 W EDGEVALE RD
BROOKLYN MD 21225-2636

DITECH FINANCIAL LLC
PO BOX 7153
PASADENA, CA 91109-7153

This is a review of the recent activity in your escrow account. It also compares our projections from your last review with the expected payments we made from your account.

| MONTH | PAYMENTS TO ESCROW | | PAYMENTS FROM ESCROW | | DESCRIPTION | ESCROW BALANCE | |
|---|---|---|---|---|---|---|---|
| | PROJECTED | ACTUAL | PROJECTED | ACTUAL | | PROJECTED | ACTUAL |
| | | | | | BEGINNING BALANCE | 657.81 | -7,372.84 |
| AUG | 235.11 | * | | 662.68 * | CNTY TX PARC | 892.92 | -8,035.52 |
| SEP | 235.11 | * | 657.81 | | CNTY TX PARC | 470.22 | -8,035.52 |
| OCT | 235.11 | 4,824.76 * E | | | | 705.33 | -3,210.76 |
| NOV | 235.11 | 303.73 * E | | | | 940.44 | -2,907.03 |
| DEC | 235.11 | 303.73 * E | 658.53 | 662.68 * E | CNTY TX PARC | 517.02 | -3,265.98 |
| JAN | 235.11 | 303.73 * E | | | | 752.13 | -2,962.25 |
| FEB | 235.11 | * E | | | | 987.24 | -2,962.25 |
| MAR | 235.11 | * E | | | | 1,222.35 | -2,962.25 |
| APR | 235.11 | * E | | | | 1,457.46 | -2,962.25 |
| MAY | 235.11 | * E | | | | 1,692.57 | -2,962.25 |
| JUN | 235.11 | * E | | | | 1,927.68 | -2,962.25 |
| JUL | 235.11 | * E | 1,504.95 | * E | HAZARD INS | 657.84 | -2,962.25 |
| | | | | | | | |
| TOTAL | 2,821.32 | 5,735.95 | 2,821.29 | 1,325.36 | | | |

An asterisk (*) indicates where a difference exists between your projected and expected account activity. The letter "E" beside an amount indicates that a payment or disbursement has not yet occurred, but is estimated to occur as shown. Payments are shown in the month received and not their month due. Please save this statement for comparison to your next analysis. Please direct any questions to our Customer Contact Center at (877) 624-0026. Discrepancies may be caused by the following:

**PAYMENT(S)**
- Monthly payment(s) were received less than OR greater than expected
- Monthly payment(s) were received earlier OR later than expected
- Previous overage was returned to escrow
- Previous deficiency/shortage was not paid entirely

**TAXES**
- Tax rate and/or assessed value changed
- Exemption status lost or changed
- Tax bill paid earlier OR later than expected
- Tax installment not paid
- Tax refund received
- New tax escrow requirement paid

**INSURANCE**
- Premium changes
- Coverage changed
- Additional premium paid
- Insurance bill paid earlier OR later than expected
- Premium not paid
- Premium refund received
- New insurance escrow requirement paid
- Force placed insurance premium paid

EXHIBIT F

 **ditech.** PO Box 6172
Rapid City, SD 57709-6172

**Annual Escrow Account
Disclosure Statement**

Statement Date: 10/06/2017
Your Loan Account Number: 0050486802

**Questions?**

View your detailed, up-to-date escrow transactions online at myaccount.ditech.com

Call Customer Service at **1-800-643-0202**
Mon. – Fri. 7 am to 8 pm CST
Sat. 7 am to 1 pm CST

9-776-10400-0001667-001-1-100-010-000-000



LISA ANDERSEN
205 W EDGEVALE RD
BROOKLYN MD 21225-2636

---

## SECTION 1 WHY AM I RECEIVING THIS STATEMENT?

We review your escrow account every year to ensure it is properly funded, based on your upcoming taxes and/or insurance premiums. This statement provides details of any changes in your escrow account and resulting changes to your mortgage payment.

Our review shows your escrow account has a **shortage of $3,269.39**. Once we pay your upcoming insurance and/or tax payments, your escrow account will fall below the required minimum balance. See Section 4 for details. Your monthly mortgage payment is also changing **December 01, 2017**. Your new payment amount depends on which option below you choose:

**OPTION 1: Pay Shortage Now**

- Pay in full by check or money order by **Nov. 24, 2017**.
- Your new monthly mortgage payment will be $591.99.

**OPTION 2: Spread Shortage Over 48 months
(No action required)**

- Add $68.11 per month for 48 months to mortgage payment.
- Your new monthly mortgage payment will be $660.10.

---

## SECTION 2 WHY ARE MY PAYMENTS CHANGING?

Changes to monthly escrow amounts are common. They're often caused by a change in your taxes and/or insurance premiums. This table shows how your escrow and mortgage payments are changing.

| | Current Payment | Changes | OPTION 1 New Payment 12/01/2017 | OPTION 2 New Payment 12/01/2017 | |
|---|---|---|---|---|---|
| Due Date | 08/01/2015 | | | | You will be notified separately when your adjustable rate mortgage is scheduled to change. |
| Principal and Interest | $297.19 | ↑ $48.08 | $345.27 | $345.27 | |
| Escrow Payment | $264.08 | ↓ $17.36 | $246.72 | $246.72 | |
| Escrow Shortage | | | | $68.11 | |
| **TOTAL** | $561.27 | ↑ $30.72 | $591.99 | $660.10 | |

We use anticipated payments from your escrow account to determine your monthly escrow payment:

Combined Property Insurance $1,666.05
Combined Taxes $1,294.59
**TOTAL OUTGOING PAYMENTS** $2,960.64 ÷ 12 months = **$246.72 Monthly Escrow**

If you use automatic bill pay, please contact your bank to adjust your mortgage payment amount, due December 01, 2017.

---

Please detach this escrow shortage coupon, write your loan number and "Escrow Shortage" on a check or money order made payable to Ditech Financial LLC, and mail both in the enclosed envelope with the mailing address visible in the window.


EQUAL HOUSING LENDER

 **ditech.**

### ESCROW SHORTAGE COUPON
This coupon and mailing address are for your escrow shortage payment only. **DO NOT use for your regular monthly mortgage payment.**

LOAN ACCOUNT NUMBER: 0050486802

LISA ANDERSEN
205 W EDGEVALE RD
BROOKLYN MD 21225-2636

Escrow Shortage
Amount Due and
Enclosed: **$3,269.39**

DITECH FINANCIAL LLC
PO BOX 7153
PASADENA, CA 91109-7153

Every year, we analyze what you'll need to pay in taxes and/or insurance premiums. We then calculate the amount you'll likely need in escrow to pay these bills. To determine if you have enough funds in your escrow account, we use this formula:

|  |  |  |
|---|---|---|
| Lowest Projected Balance | -$2,775.95 | (in gray below) |
| - Minimum Escrow Balance | $493.44 | (in gray below) |
| Shortage Amount | -$3,269.39 | |

Your escrow account has a minimum balance, as allowed by federal laws, state laws, or your mortgage contract. Your minimum balance includes up to two months of escrow payments to cover increases to your property taxes and/or homeowners insurance. Your minimum escrow balance is $493.44.

This table shows expected payments in and out of your account over the next 12 months:

| Date | What We Expect You to Pay to Escrow | What We Expect to Pay Out | Payment Description | Expected Balance | Balance Needed in Your Account |
|---|---|---|---|---|---|
|  |  |  |  | -$2,282.51 | $986.88 |
| Beginning Balance |  |  |  | -$2,659.43 | $609.96 |
| 12/17 | $246.72 | $623.64 | CNTY TX PARC | -$2,412.71 | $856.68 |
| 01/18 | $246.72 |  |  | -$2,165.99 | $1,103.40 |
| 02/18 | $246.72 |  |  | -$1,919.27 | $1,350.12 |
| 03/18 | $246.72 |  |  | -$1,672.55 | $1,596.84 |
| 04/18 | $246.72 |  |  | -$1,425.83 | $1,843.56 |
| 05/18 | $246.72 |  |  | -$1,179.11 | $2,090.28 |
| 06/18 | $246.72 | $1,666.05 | HAZARD INS | -$2,598.44 | $670.95 |
| 07/18 | $246.72 |  |  | -$2,351.72 | $917.67 |
| 08/18 | $246.72 | $670.95 | CNTY TX PARC | -$2,775.95 | $493.44 |
| 09/18 | $246.72 |  |  | -$2,529.23 | $740.16 |
| 10/18 | $246.72 |  |  | -$2,282.51 | $986.88 |
| 11/18 |  |  |  | -$2,282.51 | $986.88 |
| Ending Balance |  |  |  |  |  |
| TOTAL | $2,960.64 | $2,960.64 |  |  |  |

In this table, you can see payments you made into your escrow account and outgoing payments we made from your escrow account. If we projected to pay out a significantly different amount, you'll see the difference noted in gray. These differences may impact whether you have enough funds in your escrow account.

| Date | What You Actually Paid to Escrow | What We Expected You to Pay to Escrow | What We Actually Paid Out | What We Expected to Pay Out | Payment Description | Actual Balance | Expected Balance from Last Review |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  | -$7,866.92 | $752.47 |
|  |  |  |  |  |  | -$7,866.92 | $988.33 |
| Beginning Balance |  |  |  |  |  | -$7,866.92 | $1,224.19 |
| 02/17 |  | $235.86 |  |  |  | -$7,866.92 | $1,460.05 |
| 03/17 |  | $235.86 |  |  |  | -$7,866.92 | $1,695.91 |
| 04/17 |  | $235.86 |  |  |  | -$9,532.97 | $1,931.77 |
| 05/17 |  | $235.86 | $1,666.05 |  | HAZARD INS | -$9,532.97 | $662.68 |
| 06/17 |  | $235.86 |  | $1,504.95 | HAZARD INS | -$9,532.97 | $898.54 |
| 07/17 |  | $235.86 |  |  |  | -$10,203.92 | $471.72 |
| 08/17 |  | $235.86 | $670.95 | $662.68 | CNTY TX PARC | -$2,580.28 | $707.58 |
| 09/17 |  | $235.86 |  |  |  | -$2,282.51 | $943.44 |
| 10/17 | $7,623.64  E | $235.86 |  |  |  | -$2,282.51 | $943.44 |
| 11/17 | $297.77  E | $235.86 |  |  |  |  |  |
| Ending Balance |  |  |  |  |  |  |  |
| TOTAL | $7,921.41 | $2,358.60 | $2,337.00 | $2,167.63 |  |  |  |

E = estimated future payment

# EXHIBIT G

Lisa A. Andersen
205 W Edgevale Rd
Brooklyn Park, MD 21225

1st
QRW



December 30, 2016

Ditech Financial
PO BOX 6172
Rapid City, SD 57709

To whom this may concern,

I am writing this letter in regards to my loan modification. I am in possession of the modification documents that have been sent to me via FedEx, I am truly concerned about the amounts that have been documented on the mod package, I will be attaching the payment history to my local county property tax also my hazard insurance pays out as well. However, the numbers do not match. I would like an itemized run down of all payments that I have made towards my mortgage and payments your establishment has made on my behalf for my property tax and hazards insurance. I was also concerned about the fact that my stream line payment was $600.92 which I made for 6 months which isn't included in my loan modification and would like to know why. I also seen on my modification package that my new mortgage payment is now $712.19 which is not affordable to me, I would like to save my home. This is why I took the avenue to do a loan modification. Please look further into this matter and forward me all the documents.

Warm regards,

Lisa A. Andersen

CC: Fannie Mae



# EXHIBIT H

# Lisa Andersen 205 W. Edgevale Rd

Baltimore, MD 21225 443-345-6221 landersen@cohenpushkin.com

November 15, 2017

Ditech Financial LLC
P.O.BOX 6172
Rapid City, SD 57709-6172

Loan #50486802
Lisa Andersen
205 W. Edgevale Rd
Brooklyn Park, MD 21225

RE: RESPA Qualified Written Request

Dear Recipient:

I am writing to you to request specific itemized information about the accounting and servicing of my mortgage in order to assist me in understanding various charges, credits, debits, transactions, actions , payments, analyses and records related to the servicing of my loan from its inception to present date.

I am disputing the validity of the current debt you claim that I owe. To date, your company has failed to answer any of my written correspondences or telephone communication concerning the servicing of my mortgage, including (but not necessarily limited to) letters dated 8/13/15, 4/2/16, 12/30/16, 7/3/17, 8/22/17 or responded to the telephone conference between Ditech Account rep Carolyn @ extension *23106 & Monica *23066,  myself and Manchester Legal Group on 10/6/17.

Based in part on your repeated failure to respond to my correspondence concerning the servicing of the servicing of my mortgage, I have reason to believe that your calculations are in error.

To independently validate this debt, I need to conduct a complete exam, audit, review and accounting of my mortgage loan from its inception until the present date.

To conduct this examination and audit, I need to have a full and immediate disclosure including copies of all pertinent information regarding my loan. The documents requested and answers to questions are needed to ensure the following:

- That each service and sub-servicer of my mortgage has serviced my mortgage in accordance with the terms of my mortgage, original promissory note and/or deed of trust;
- That each servicer and sub-servicer of my mortgage in compliance with local, state and federal statues, laws and regulations;
- That my loan has properly been credited, debited, adjusted, amortized and charged correctly;
- The interest and principal have been properly calculated and applied to my loan;
- That my principal balance has been properly calculated and accounted for;
- That no charges, fees or expenses that I am not contractually bound to pay have been charged or assessed to or collected on my account;

To validate my debt and audit my account, I need copies of pertinent documents to be provided and answers in writing to various servicing questions to be sent to me at the above-noted address:

For each record kept on computer or in any other electronic file or format, please provide a paper copy of all information in each filed or record in each computer system, program or database used by you that contains any information on my account.

As such, please send to me the address above, copies of the documents requested below as soon as possible.

*Please proved me copies of:*
- All deeds in lieu, modifications to my mortgage, the **original** promissory note or deed of trust from the **inception** of my loan to the present date.
- All contracts or agreements bearing my signature, specifically including but not limited to the **original mortgage agreement**.
- The front and back of each and every canceled check, money order , draft, debit or credit notice issued to any servicer of my account  for payment of any monthly payment, other payment, escrow charge ,fee or expense on my account.
- All escrow analyses conducted on my account from the **inception** of my loan **until the date of this letter;**
- The front and back of each and every canceled check, draft or debit notice issued for payment of closing costs, fees and expenses listed on my disclosure statement including, but not limited to appraisal  fees, inspection fees, title searches ,title insurance fees, hazard insurance premiums, commissions, etc.
- Front and back copies of all payment receipts, checks , money orders, drafts, automatic debits and written evidence of payments made by me or by others on my account.
- All copies of property inspection reports, appraisals, BPO's and reports done on my property.
- All invoices for each charge such as including, but not limited to, appraisal fees, inspection fees, hazard insurance premiums,

commissions, or any other expenses which has been charged to my mortgage account from the **inception** of my loan to **present date**.

- All loan servicing records, payment payoffs, payment calculations, ARM audits, interest rate adjustments, payment records, transaction histories, loan histories accounting records, ledgers and documents that relate to the accounting of my loan from the inception of my loan until present date.
- All loan servicing transaction records, ledgers, registers and similar items detailing how my loan has been serviced from the **inception of my loan until present date**.

Further, in order to conduct the audit and review of my account, and to determine all proper amounts are **truly due**.

I need the following answers to questions concerning there servicing and accounting of my mortgage account from its **inception to the present date**.

Accordingly, please provide me, in **writing**, detailed answers to the questions listed below.

1. In a spreadsheet form or in a letter form in a columnar format, please detail for me each and every credit on my account and the date such credit was posted to my account as well as the date any credit was received.
2. In a spreadsheet form or in a letter form in columnar format, please detail for me each and every debit on my account and the date such credit was posted to my account as well as the date any debit was received.

*ORIGINAL DOCUMENTANTION*:

1. Where is the **original** promissory note or mortgage I signed located? Please describe its physical location and anyone holding this note as a custodian or trustee if applicable.
2. Where is the **original** deed of trust I signed located? Please describe its physical locations and anyone holding this note as custodian or trustee if applicable.

*LATE FEES:*

1. Have you reported the collection of late fees or late charges on my account as interest in any statement to me or to the IRS?

*Correspondence:*

1. Do you deny the receipt of my correspondence bearing the following dates, or existence of such correspondence in your files; 8/13/15, 4/2/16, 12/30/16, 7/3/17, 8/22/17?

Please provide me with the documents I have requested and a detailed answer, in writing, to each of my questions within the **required lawful time frame**.

Upon receipt of the documents and answers, an exam and audit may be conducted that may lead to a further document request and answers to questions under and additional QWR letter.

I understand that under **Section 6 of RESPA** you are required to acknowledge this request within **5** business days and must demonstrate a good faith effort to resolve the issue within **30** business days. Unless, requested in writing to me as the borrower for an extension no more than **15** days additional.

As such, I anticipate and appreciate your thorough and timely response so that this matter may be swiftly and fully resolved.

Sincerely,

*Lisa A.*

EXHIBIT I



**Ditech Financial LLC**
P.O. Box 6172
Rapid City, SD 57709-6172
T: (800) 643-0202
F: (866) 870-9919
ditech.com

December 20, 2017

LISA ANDERSEN
205 W EDGEVALE RD
BROOKLYN MD 21225

RE: Ditech Financial LLC ("Ditech")
    Account Number: 50486802

Dear Lisa Andersen:

This letter is in response to your correspondence received by Ditech regarding the above-referenced account number.

Our records indicate that we have previously responded to your inquiries and have enclosed copies for your records. We have enclosed copies of the responses sent on December 11, 2017, November 22, 2017, and September 18, 2017.

The foreclosure attorneys are the BP Fisher Law Group. The loan was referred to them on November 24, 2014. If you have questions regarding the status of the foreclosure process and all communication regarding the foreclosure will come from them. They can be reached at 1-301-599-7700.

If you have any further questions or concerns, please contact our Customer Service Department at (800) 643-0202, Monday - Friday, 7:00 a.m. to 8:00 p.m. CT, and Saturday 7:00 a.m. to 1:00 p.m. CT.

Sincerely,

Ditech
Customer Service

**THIS INFORMATIONAL NOTICE IS NOT AN ATTEMPT TO COLLECT A DEBT. IF YOU ARE CURRENTLY IN BANKRUPTCY OR YOU DISCHARGED THIS DEBT IN A BANKRUPTCY, THE SERVICER IS NOT ATTEMPTING TO COLLECT OR RECOVER THE DEBT AS YOUR PERSONAL LIABILITY.**

LLzdjm9QNu



EQUAL HOUSING
**LENDER**
LTR-199